[Civ. Nos. 20786, 20787. Second Dist., Div. Three. Nov. 17, 1955.]

MARTY MARTYN et al., Appellants, v. JACQUES LESLIE et al., Respondents.

[Two Cases.]

*Assigned by Chairman of Judicial Council.

Minter & Feder and Stanley M. Arndt for Appellants.

Belcher, Kearney & Fargo and George M. Henzie for Respondents.

NOURSE (Paul), J. pro tem.*—The above entitled actions were consolidated for trial. The action in which Leslie and Hungate are the only defendants will be hereinafter designated the second action. The lower court did not follow the rule laid down in *Wolfson* v. *Beatty*, 118 Cal.App.2d 392, at 398 [257 P.2d 1017], but made findings of fact and conclusions of law and judgments in each case. The record here, therefore, consists of one reporter's transcript and two clerk's transcripts.

*Assigned by Chairman of Judicial Council.

The plaintiffs appeal from the judgment in favor of the defendants in each action. What we will hereafter say will apply to both appeals unless the context indicates to the contrary.

The issues will be clarified by an analysis of the pleadings. In the following analysis the amounts set forth in brackets are taken from the allegations in the second action. In substance, the plaintiffs allege that plaintiffs were partners doing business under the fictitious name and style of "Marted"; that defendants Leslie and Hungate were, at all times mentioned in the complaint, joint adventurers and partners in the transactions therein set forth and that the defendant Leslie acted for himself and as the duly authorized agent of the defendant Hungate; that the defendants loaned to the plaintiffs the sum of $36,000 [$28,000] and that contemporaneously with the making of the loan, the plaintiffs executed the written instruments labeled "Assignment," a copy of which is annexed as Exhibit A to the complaint. That pursuant to the terms of Exhibit A, the plaintiffs executed to defendants their promissory note in the sum of $35,500 [$27,500] payable on or before six months after its date and bearing interest at 5 per cent per annum [6 per cent] and secured by chattel mortgage. A copy of the note is set forth and incorporated as Exhibit B. That by the terms of Exhibit A plaintiffs agreed to sell and assign to defendants 15 per cent of their right, title and interest in a series of television programs which were described in Exhibit A and known as "Double Play," in consideration of the payment by defendants to plaintiffs of the sum of $500. That said Exhibit A further provided that plaintiffs were granted an option to reacquire said 15 per cent interest for the sum of $8,000 [$6,750], said option to be exercised in writing within 30 days after the expiration of six months from the time of sale. That as partial security, the defendants required that defendant United Television Programs, Inc., and its president, one King, execute a written guaranty for the payment of said promissory note, a copy of that guaranty being annexed to the complaint and incorporated in Exhibit C. That as part of the transaction and prior to making the loan, the defendants further required United and King to execute "a guaranty agreement" guaranteeing that if the plaintiffs failed to exercise their option to repurchase said 15 per cent interest from the defendants, then United and King would, upon demand, purchase said interest for the sum of $8,000 [$6,750].

The copy of said alleged guaranty is made a part of the complaint as Exhibit D. That in truth and in fact the sale of said 15 per cent interest by the plaintiffs to the defendants, the option granted to plaintiffs to repurchase said 15 per cent, and the guaranty of United and King to purchase said interest in the event plaintiffs failed to do so, was a sham, subterfuge, trick and device on the part of defendants to exact a bonus of $7,500 [$6,250] in addition to the interest reserved by the promissory note and for the loan of the $36,000 [$28,000] and to evade the Usury Act of the State of California and article XX, section 22 of the Constitution of this state. That plaintiffs paid to the defendants the principal of said promissory note together with the interest reserved therein and within the option period paid to the defendants the sum of $8,000 [$6,750] and that of said sum of $8,000 [$6,750] the sum of $7,500 [$6,250] was in truth and in fact a bonus paid to the defendants for the loan of $36,000 [$28,000] and over and above the interest reserved by the promissory note. That the return of interest charged by the defendants for said loan is not clearly or otherwise expressed in writing, nor was any return of interest clearly expressed in writing, other than the 5 per cent set forth in the promissory note. That the defendants and each of them have exacted, demanded and received in the aggregate $8,036.21 [$6,931.61] for the use of the amount of $36,000 [$28,000] actually loaned to the plaintiffs. That treble the amount so received, to wit, $24,108.63 [$20,794.83] is payable to plaintiffs from the defendants.

By a second cause of action which is in the form of a common count for money had and received, plaintiffs allege that the defendants are indebted to them in the amount of the interest and alleged bonus paid and that no part of said sum has been paid.

The defendants by their answer admit the execution of all the instruments referred to in the complaint. They deny that Leslie and Hungate were partners or joint venturers in the transactions described in the complaint or that Leslie acted as agent for Hungate in those transactions. They allege that Leslie at all times mentioned in the complaint was a joint venturer with the plaintiffs and that acting as such and as the agent for the plaintiffs, participated in the transactions involved. They deny that they had loaned to the plaintiffs the sum of $36,000 [$28,000] or any amount in excess of the sum of $35,500 [$27,500], and allege that con-

currently with the making of said loan they had purchased from the plaintiffs for the sum of $500, a 15 per cent interest in the proposed television series described in the complaint and had granted the plaintiffs an option to repurchase said interest for the sum of $8,000 [$6,750]. They deny that they had required the execution of the guaranty agreements annexed to the complaint, but allege that said guaranty agreements were executed by United and King as an inducement to the defendants to make said loan and to purchase said 15 per cent interest. They deny that the option and guaranty agreements were a sham, subterfuge, trick or device to exact a bonus in any sum whatsoever. They admit the payment to them of the principal and interest provided for in the promissory note and admit the receipt from the plaintiffs of the further sum of $8,000 [$6,750], but allege that prior to the payment to them of said sum plaintiffs had voluntarily exercised their option to repurchase said 15 per cent interest and that upon the payment to them of said sum they retransferred and reassigned to plaintiffs said interest. They deny that said sum of $8,000 [$6,750] or any part thereof was paid or received as a bonus for any loan. They acknowledge receipt of the interest reserved under the terms of the promissory note, but deny that they exacted, demanded or received any bonus or additional interest and deny that there is any sum due to the plaintiffs. They deny the material allegations of the second alleged cause of action. In an affirmative defense defendants plead facts which they assert estopped plaintiffs from asserting that the monies paid to them were paid as a bonus or interest or were usurious. It is not necessary here to go into the details of these affirmative allegations. In the second action, defendant Leslie cross-complained against the plaintiffs.

From this analysis of the pleadings it appears that the issues of ultimate fact tendered by the pleadings were:

First, was the assignment to the defendants with the option to the plaintiffs to repurchase and the agreement of United and King to purchase the 15 per cent interest, a subterfuge and sham to cover the real transaction between the parties?

Second, was there in fact a loan to the plaintiffs of the sum of $36,000 [$28,000]?

Third, were the amounts paid by the plaintiffs in the exercise of the alleged option in fact the payment of a bonus for the loan rather than the payment of a purchase price?

Fourth, were the plaintiffs estopped?

Upon all of these issues of fact, the trial court made findings against the plaintiffs and in favor of the defendants. The appellants make four assignments of error on this appeal: (1) that the court erred in not holding that usury was involved; (2) that the court erred in its ruling as to the admission of evidence; (3) in giving judgment to the defendant Leslie on his cross-complaint; and (4) that certain findings are contrary to the evidence.

Appellants' first and fourth assignments of error in reality constitute a claim on their part that the findings are contrary to and not supported by the evidence. We have come to the conclusion that the findings, with certain exceptions hereafter noted, are supported by substantial evidence.

The following facts were established either without contradiction or by substantial evidence:

The defendant Leslie was at all times material to the controversy here the attorney for the plaintiffs and acted as such in the drafting of all of the pertinent instruments and in the negotiations between the plaintiffs and the other defendants involved in the first action and between the plaintiffs and himself and the defendant Hungate involved in the second action. He was also, at all times, the owner of an interest in the business conducted by the plaintiffs and to which business the transactions involved here relate. He also, at times acted for his codefendants and received compensation from them. He held, as trustee for the benefit of himself and his codefendants, practically all of the assets of the plaintiff partnership. To say the least he carried water on both shoulders.

The plaintiffs were partners doing business under the name of Marted. Upon the formation of the partnership they undertook the production of a television program entitled "Double Play" in which were to be starred a nationally known baseball personality and his wife, a well known actress. This program was to consist of a serial running through 26 (later changed to 39) episodes, one to be released each week.

The partners entered into a contract with one Mohr whereby he agreed to finance the productions and to distribute them. Three episodes were produced with money advanced by Mohr, but he failed to advance enough to pay the salaries ($1,250 per week) of the stars and certain other expenses incurred, and refused further advances.

The plaintiffs then produced three more episodes with

monies procured from various sources, but the stars still remained unpaid and the partnership was now indebted to the stars in the sum of $7,500 for salaries and to a bank from which it had borrowed the sum of $2,500, upon the guaranty of the defendant Leslie. It was unable to proceed with the production of the remaining episodes and unless it could proceed, the six that it had produced were worthless.

At this time, and in February, 1952, the partnership entered into two further contracts, both drafted by Leslie. By the first of these, the partnership agreed that Leslie should receive 15 per cent of the net profits of the entire series as compensation for the legal services performed and to be performed by him for the partnership (Marted). It further assigned to him an undivided 15 per cent of all assets and profits now owned or which might be hereafter acquired by it. The second contract was with United Television Programs, Inc., hereinafter called "United," of which corporation one Gerald King was president. This contract will be hereafter referred to as the "distribution agreement." By it United was given the exclusive right to distribute the entire series and agreed to advance $2,500 in cash to pay off the partnership indebtedness to the bank, and to deliver to the stars the promissory note of another corporation in satisfaction of the $7,500 due them as salary. By the contract United was entitled to certain percentages of all amounts received from sponsors of the series but agreed to forego its commission from the first $81,000 of gross returns and in lieu thereof to take double commission on the second $81,000 of gross returns. This was to enable the partnership to use the first gross returns to further finance the venture. Shortly thereafter, the partnership's agreement with Mohr was cancelled and he agreed to take a stated amount out of 50 per cent of the net profits in lieu of any rights he might have in the venture under the cancelled contract.

The partnership now sought further financing but was unable to procure it. While the partnership was endeavoring to further finance its venture. King discussed the matter with the defendant Wain (United's accountant) telling him that if he, Wain, would finance the remaining portion of the series United would defer its commission until Wain's investment was repaid and that King and United would guaranty him against loss. Wain told King he had a friend, the defendant Shane, who might be interested in coming in with him, but that both he and Shane were primarily interested

in capital gains, not ordinary profits. Wain contacted Shane, and Shane King. King advised Shane that he could guarantee the results of the deal because of commitments and contracts he already had with sponsors. King advised plaintiffs of Shane's and Wain's interest, and at their request, defendant Leslie contacted them. They told Leslie that they were not interested in the deal unless something could be worked out that would result in their realizing a capital gain. They later told him they would not be interested unless Leslie himself went into the deal. Leslie advised plaintiffs of his conversation with Wain and Shane and later advised them that he had devised a scheme which he thought would satisfy Wain and Shane and which might result in their realizing capital gains. Plaintiffs directed Leslie to submit the scheme to Wain and Shane. This he did. The scheme was, in substance, that defendants would loan the partnership $37,500 and would purchase from plaintiffs a 15 per cent interest in "Double Play," plaintiffs to reserve an option to repurchase this interest at a date six months after the consummation of the purchase from the partnership. Upon the scheme being presented to Shane, he advised Leslie that before he would go ahead he wanted to find out if King would stand by his statement that he and United would guarantee him (Shane) against loss. Shane contacted King and told him he would make the deal as outlined by Leslie if King and United would: (1) guarantee the loan; (2) allocate the first money received from distribution to repayment of the loan, and (3) agree to purchase for $8,000, the 15 per cent interest which defendants were to purchase from plaintiffs if they (plaintiffs) failed to exercise their option to repurchase. To this King agreed.

Leslie then drafted four instruments. The first of these instruments was designated "Assignment," and will be hereafter so designated.

By the terms of this agreement, the plaintiffs assigned to defendant Leslie all their interest in the television program series, including all negatives, etc., made or developed in connection therewith, their agreement with Mohr, their agreements with the stars, their agreement with United, to be held by him in trust for defendants Shane, Wain, and Leslie and for Gerald King, until such time as the plaintiffs should have executed chattel mortgages, assignments of accounts receivable, notes, pledges and "any other documents that may be required in connection with the loan to us of $35,500." They further agreed to execute an agreement guaranteeing that

twelve additional films in the series would be produced for the sum of $35,500; that if sums in excess of $35,500 were required to be advanced by the lenders, they would convey absolutely to the lenders a 5 per cent interest in the enterprise for each $1,000 so advanced. They further agreed that all sums so advanced should be recouped and paid "from the proceeds accruing from the distribution and exploitation of the television series together with interest at 5 per cent per annum." They agreed to execute a document providing for the repayment of $35,500 together with interest at 5 per cent per annum "which sum shall be payable from the first proceeds derived from the distribution and exploitation of said television series." They agreed to sell to defendants Shane, Wain and Leslie a 15 per cent interest of their right, title and interest in the television program in consideration of payment to them of the sum of $500, and in further consideration, that they be granted an option to repurchase said 15 per cent interest for the sum of $8,000, said option to be exercised in writing at any time after September 1, 1952, and prior to October 31, 1952. By the terms of the instrument, Leslie was directed and authorized to hold any monies payable to the plaintiffs by United under the distribution agreement until such time "as we shall advise him whether or not it is our intention to exercise said option."

The second instrument has been referred to in the record as a promissory note, and will be hereafter referred to as such. By the terms of this instrument the plaintiffs promised to pay on or before six months to defendants Shane, Wain and Leslie the sum of $35,500 with interest at 5 per cent per annum, "pursuant to the terms of those certain agreements dated March 14, 1952, entered into in connection with a series of television photoplays produced under the title 'Hot Stove League' or 'Double Play' or both."

The third agreement is entitled "Guaranty Agreement," but hereinafter will be referred to as the "Note Guaranty." By the terms of this instrument United and King, as an inducement to the three defendants above named to lend to plaintiffs the sum of $35,500, guaranteed repayment to the lenders of said sum with interest. United agreed by the terms of the instrument to transfer and assign to the defendants all monies received by it under its distribution agreement until such time as the sum of $35,500, with interest, had been paid to the defendants. King and United

agreed that if they were required to make good upon their guaranty, they should do so by paying the lenders not less than the sum of $2,000 per week. By the terms of the instrument, defendants Shane, Wain and Leslie agreed to loan plaintiffs the sum of $35,500. The instrument was signed by United, King and the three defendants named.

The fourth agreement was also entitled "Guaranty Agreement," but will be here referred to, in order to distinguish it from the note guarantee, as "United Purchase Agreement." By the terms of this agreement it was provided that as an inducement to defendants Shane, Wain and Leslie to purchase an undivided 15 per cent interest in the television program, United and King would, in the event plaintiffs failed to exercise their option to repurchase said 15 per cent interest on or before October 31, 1952, on demand of the defendants, purchase said interest and pay therefor the sum of $8,000.

The first of these four instruments is dated March 17, 1952. The others are all dated March 14, 1952, but it is apparent from the record that they were all executed on the 17th, and the court so found.

There also was drafted an instrument entitled "Mortgage of Chattel, Pledge and Assignment," by the terms of which plaintiffs mortgaged the six television photoplays theretofore produced, all other television photoplays thereafter produced in connection with the series and all literary, musical or dramatic or other material upon which the programs were based, all copyrights in the physical properties used in connection therewith to secure the payment of $35,500 with interest and any additional sums loaned by the mortgagee to the plaintiffs. Defendant Shane was the only person named as mortgagee.

Upon the execution of these instruments, the defendants paid to the plaintiffs the sum of $36,000. Of this sum one-third was advanced by Shane, one-third by Wain, one-sixth by Leslie and one-sixth by Hungate, Hungate having been declared in on the deal through a collateral agreement between himself and Leslie.

The $36,000 was all deposited in one bank account established in the name of Martyn, Leslie and King. Between March 17, and the first part of May, 1952, 12 pictures or episodes were produced and sales to exhibitors totaling more than $80,000 had been made by United which reported to defendant Leslie that the weekly income from these contracts

was sufficient to cover the loans made by the defendants "plus the repayment fee."

This money was not immediately available and $27,000 additional capital was required to produce the additional pictures necessary to make the total number of 26 which United had guaranteed to the exhibitors with which it had signed contracts.

Wain and Shane were unwilling to do any further financing and plaintiffs were unable to interest others, but finally induced Leslie and Hungate to do the financing. Leslie then prepared documents which were duplicates of the documents prepared as to the first transaction, except that Hungate and Leslie only were involved as lenders and purchasers, and the principal sum in the promissory note was $27,500, and the rate of interest 6 per cent. There was, of course, a difference in the dates of payment and in the option dates.

This series of documents and the transactions under them are the basis of the second action. Upon the new contracts of guarantee and purchase by United and King being prepared, plaintiff Martyn took them to King and requested that he execute them. King at first refused, but after a conference with defendant Leslie, executed them. After the execution of these documents, Leslie and Hungate, over a period extending from May 16, to June 26, advanced the sum of $28,000, which was placed in an account in the name of "Leslie or Hungate and Kneeland or Martyn."

The principal and interest on the note of $35,500 were paid in installments covering the period from June 3, through August 6, 1952.

Shortly after the date upon which the plaintiffs could first exercise their option to repurchase the 15 per cent interest sold to the defendants in the first transaction, they did in writing exercise their option. They did this without any request or demand being made upon them by the defendants so to do. By their direction, defendant Leslie, on September 19, paid to himself and his three codefendants from the funds held by his as trustee, the total sum of $8,000, that being the option price.

Thereafter, the remaining films were produced. But prior to the date upon which the plaintiffs could exercise their option to repurchase the 15 per cent interest assigned to Leslie and Hungate in the second transaction, plaintiff Martyn had an opportunity to sell his interest in the venture to one Sax, but Sax would only buy if he could secure a 50 per cent

interest in the venture. At this time Leslie held a 20 per cent interest (this being the amount assigned to him, separate and apart from the 15 per cent interest involved in the transactions we have mentioned). Martyn told Leslie and Hungate that he and Kneeland would not exercise their option to repurchase the 15 per cent assigned to said defendants unless Leslie would reduce his 20 per cent interest to 8 per cent. This Leslie finally agreed to and he and Hungate also agreed to permit the option to be exercised prior to the expiration of the six-month period. They were paid not only the principal and interest on the note of $27,500, but the option price of $6,750. Shortly thereafter, these actions were commenced and at the time of the payments last mentioned the plaintiffs had in contemplation the commencement of these actions.

While undoubtedly from the facts we have stated, and other evidence received, the trial court might well have drawn inferences that would have upheld findings that these transactions were usurious and that the sale and option to repurchase, together with the "United Purchase Agreement," were but a cloak devised to hide the real transactions, and that there were in fact loans of $36,000 and $28,000, it was not bound to draw these inferences. On the other hand, the facts established by the evidence and hereinbefore set forth, undoubtedly support the findings made.

What inferences should be drawn from the evidence is the province of the trial court, not this court. (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].)

Here the instruments did not on their face show a loan or forbearance of money, except to the extent of amounts set forth in the promissory notes. These instruments on their face do show the sale of an interest in motion pictures to be produced, with an option in the plaintiffs to repurchase. It was for the trial court to determine from all of the circumstances whether the intent of the parties was that disclosed by the face of the instruments or whether in fact those instruments were a sham and a subterfuge to cover up the real intent of the parties.

Appellants contend, if we understand them correctly, that the facts we have stated compel the drawing of the inference that the transaction was in reality a loan of $36,000 [$28,000], and that the sale with options to repurchase and the guaranties were but a subterfuge to cover up the true nature of the transaction. While they point to a number of facts shown by the evidence from which inferences could be drawn

which would support findings in their favor, their main reliance is upon the fact that because King and United had agreed that they would, upon demand of the defendants, purchase the 15 per cent interest sold to the defendants in the event the plaintiffs failed to exercise their option to repurchase, and as there was an absolute promise on the part of the defendants to repay $35,500 [$27,500], none of the defendants' money was at hazard and that therefore, the entire transaction must be treated as a loan.

They rely principally upon *Martin* v. *Ajax Construction Co.*, 124 Cal.App.2d 425 [269 P.2d 132]. That case, however, is not in point here. In the cited case plaintiffs had loaned to defendants the sum of $5,000, and received back from the defendants an unconditional note in the sum of $10,000, payment of which was guaranteed by the principal stockholders of the defendant. In the cited case, the instruments on their face showed a loan of $5,000 and an unconditional promise to repay $10,000, within one year, although a collateral agreement did provide for payments to be made upon the note out of funds derived by the defendant from a construction project for which the monies were borrowed. In the case at bar, the instruments on their face show a loan of $35,500 [$27,500], with a guaranty of that loan by United and King. But they further show on their face a purchase of a 15 per cent interest in the series of motion pictures (not in Marted, the plaintiff partnership) with an option on the part of the plaintiffs to repurchase their interest at a price greatly in excess of that for which they had sold it.

It is true that by means of the "United Purchase Agreement" defendants insured themselves not only against loss, but of a profit. However, they did not thereby exact any payment from the plaintiffs. The plaintiffs were under no obligation to exercise their option, and there was no evidence that they were in anywise obligated to reimburse King or United if they purchased the 15 per cent interest. The evidence is all to the contrary.

The "United Purchase Agreement" was not a contract of guaranty, though so denominated. A guarantor is one who promises to answer for the debt, default or miscarriage of another (Civ. Code, § 2787). King and United did not by this contract undertake to answer for any debt or default of plaintiffs, for, as we have pointed out, plaintiffs had the right, but not the obligation, to exercise their option. By failing to exercise it, they did not default in the performance

of any obligation owed to defendants, and King's and United's obligation to purchase could only arise after the plaintiffs' rights to purchase had expired. This being true, there is nothing in the agreements that exacted from plaintiffs any interest or charge for the use or forbearance of money, other than the lawful interest reserved in the promissory notes.
 It is only the unlawful exaction of interest or other charges for the use or forbearance of money that is prohibited by the Usury Act and the Constitution.

While it is apparent from the evidence, despite the findings of the trial court to the contrary, that defendants would not have loaned the $35,500 [$27,500] to the plaintiffs, or have purchased the 15 per cent interest, unless they could protect themselves not only against loss of the money loaned and their investment, but also against the loss of the expected capital gain, this does not establish, as a matter of law, the exaction of anything from the plaintiffs other than the interest that they expressly promised to pay. The fact that the defendants, through contracts with third persons, insured themselves against loss and insured themselves a profit over and above the rate of interest which they would have been entitled to receive had the transaction in fact been that of a loan, does not establish usury. (55 Am.Jur. 386; 91 C.J.S., Usury § 47, p. 630; *Salvin* v. *Myles Realty Co.,* 227 N.Y. 51 [124 N.E. 94, 6 A.L.R. 581] ; *McArthur* v. *Schenck,* 31 Wis. 673, 677 [11 Am.Rep. 643] ; *Wilhoit* v. *Flack,* 123 Ark. 619 [185 S.W. 460] ; *Gleason* v. *Childs,* 52 Vt. 421.)

Appellants further assert that the inadequacy of the price of $500, paid for the 15 per cent interest in each transaction, shows that the sale of that interest was but a subterfuge under the Usury Act. Undoubtedly, it is true that if as a part of a transaction through which a loan of money is made, the lender in addition required the borrower to sell to him property of a value much in excess of the price paid, the excess value of this property will be considered as an exaction for the use of the money and will render the entire transaction usurious. The Usury Act, by its express terms, prohibits the taking of property, as well as money, for the loan or forbearance of money, if the value of the property taken exceeds the lawful charge. (Deering's Gen. Laws, 1953, Act 3757, § 2.)

 In the case at bar, however, no direct evidence was offered to establish the value of the interest purchased by the defendants. There was evidence from which it might

have been possible for the court to draw the inference that this 15 per cent interest had a value in excess of the $500 paid for it, and it may be that it could have drawn the inference that the value of this interest was so great as to make the transaction usurious. The trial court was not bound to draw these inferences. On the other hand, there was direct evidence that at the time of the transactions, the interest purchased had little if any present value, although it undoubtedly had a comparatively large prospective value which depended upon the success of the venture. The evidence, therefore, supported the findings of the trial court that the price paid by the defendants was adequate and we cannot substitute our judgment for its.

Appellants also specifically attack a number of the findings made by the trial court as being contrary to the evidence. What we have said covers all of these assignments of error, except three. In finding Number 3 the court found that the defendant Leslie had at no time acted on behalf of the defendant Hungate. This finding is contrary to all of the evidence, as it is clear that Leslie was Hungate's agent and that he acted for him in both transactions. This issue, however, was not a material one in view of the court's finding upon the other issues. It might have been material in order to hold Hungate in the first transaction had the court's findings upon the other issues been in favor of plaintiffs.

By finding Number 17 the court found upon many probative facts, none of which, however, is inconsistent with its findings upon the ultimate facts we have heretofore mentioned. Some of the probative facts found seem to us to be unsupported by the evidence, but had the findings been to the contrary, it could not have affected the court's findings upon the ultimate facts. In this finding the court found, among other things, that the $35,500 [$27,500] loan was payable out of the proceeds of the distribution of the television series and that said loan was, therefore, uncertain and speculative and a hazard upon the success of the venture. Considering the terms of the assignment and the note alone, this finding would be fully sustained by the evidence. By the assignment it was provided that the plaintiffs would execute a document providing for the repayment of the sum of $35,500, together with interest thereon "which sum shall be payable from the first proceeds derived from the distribution and exploitation" of the television series, and the promissory note executed pursuant to the assignment provides for its payment pursu-

ant to the terms of the agreement just quoted from. Plaintiffs' promise to pay, therefore, was not an unconditional one, but a promise "to pay out of a particular fund." When, however, these instruments are read in connection with the "Note Guaranty" executed by King and United as a part of the same transaction, the finding ceases to be supported by the evidence, for by the terms of the "Note Guaranty" the guarantors were unconditionally bound to pay the defendants $35,500 [$27,500], if plaintiffs did not, and plaintiffs as principals would, consequently, be likewise bound. Inasmuch, however, as the court found that the sale and option portion of the transaction was not a part of the loan transaction, the fact that the finding we have just discussed is contrary to the evidence cannot affect the judgment.

The court, by its conclusions of law, found that the plaintiffs were estopped from asserting that the loan made by defendants to plaintiffs was usurious or in violation of the usury laws or of the pertinent provisions of the Constitution. This conclusion is based upon the facts found in paragraphs 22 and 23 of the findings. By these the court, in substance, found that the plaintiffs freely and voluntarily and without obligation so to do, exercised their option to repurchase the 15 per cent interest which they sold to the defendants, and that in paying to the defendants the sum of $8,000 [$6,750] they deliberately and intentionally led defendants to believe that they were in good faith exercising the option and repurchasing said 15 per cent interest, and to believe in the validity of the loan, purchase and the option to repurchase, and in reliance thereon to in good faith make said loan and purchase and to permit plaintiffs to exercise their option to repurchase. These findings and conclusions (except the finding that the plaintiffs freely and voluntarily and without obligation exercised their option) are, as appellants say, "amazing." The whole scheme was the device of the defendant Leslie. ■ If it was a subterfuge and the transaction was in reality but a loan of money, no one knew it better than he and his codefendants, and no borrower is estopped from asserting usury merely because he has knowingly met the usurious exactions of the lender. (*Stock* v. *Meek,* 35 Cal.2d 809, 817 [221 P.2d 15]; 39 Cal.L.Rev. 604, 607-608.) But here again these findings and conclusions are not material, for inasmuch as the court's findings of fact and conclusions of law upon the other issues tendered by the complaint and answer (exclusive of the affirmative defense)

upheld and compelled the judgment rendered, the question of estoppel was no longer of importance.

▮ Appellants make two assertions of error as to the trial court's rulings on the admission of evidence. The major part of the testimony taken at the trial consisted in the reading of the depositions of the parties. The plaintiffs had taken the depositions of the defendants, and the defendants those of the plaintiffs. The plaintiffs offered and read into evidence the depositions taken by the defendants. In a number of instances, in answers to questions propounded at the taking of their depositions by counsel for the defendants, the plaintiffs had given answers which were subject to a motion to strike, upon the ground that the answers constituted hearsay or a conclusion of the witness or as not responsive. When the evidence elicited by these questions was offered by the plaintiffs, defendants' counsel objected upon the appropriate ground. The trial court sustained the objections to the reading of the answers, or where they had been read, struck the answers. It was appellants' contention in the trial court, and is their contention now, that the answers having been elicited by questions asked by counsel for the respondents on the taking of the deposition, he waived all right to object to the answers given.

Insofar as the rulings of the trial court were based upon the grounds that the answers were not responsive are concerned, there can, of course, be no possible merit in appellant's point, for that ground for a motion to strike would have been open to respondents had they offered the testimony of these witnesses by themselves reading the depositions (Code Civ. Proc., § 2056).

▮ As to the rulings that were based upon the grounds that the answers constituted hearsay or a conclusion of the witness, the rulings of the trial court were correct. Appellants rely, in support of this point, upon the case of *McClenahan* v. *Keyes*, 188 Cal. 574 [206 P. 454], and a number of cases from other jurisdictions. These cases are not in point. Each of them involved waivers as to the competency of the witness to testify. None of them involved the competency of the testimony which he gave. In each of the cited cases (most of them involved the Dead Man's statute) the court held that although the witness was incompetent to testify, when the party who had the right to claim his incompetency *made him a witness* by taking his testimony by means of a deposition, he waived his right to claim the incompetency. That is not the situation here. Here the witness was competent, but the

testimony he gave was incompetent. This incompetency the examining party did not waive, for he was not bound to offer this testimony at the trial, and if the opposing party did use it he could only do so "subject to all legal exceptions" unless the objection went to the form of the question. (Code Civ. Proc., § 2032.) This same question was raised and decided adversely to appellants in *Madera Ry. Co.* v. *Raymond Granite Co.*, 3 Cal.App. 668, 686 [87 P. 27].)

Appellant contends that the parol evidence rule is not applicable in cases involving the claim of usury and that parol evidence is, in such cases, admissible to show the actual nature of the transaction, and in no way depends upon the existence of an ambiguity in a written contract. In this claim he is fully supported by the decisions of our Supreme and appellate courts. (*Terry Trading Corp.* v. *Barsky*, 210 Cal. 428 [292 P. 474]; *Milana* v. *Credit Discount Co.*, 27 Cal.2d 335 [163 P.2d 869, 165 A.L.R. 621]; *Van Noy* v. *Goldberg*, 98 Cal.App. 604 [277 P. 538].)

The trial court did not, however, as appellants claim, violate the rule established by these cases. The trial court struck out certain answers given by the plaintiff Kneeland concerning his understanding of the contracts. None of these answers concerned any conversation with the defendants or any of them, or any fact or circumstance surrounding the making of the contracts, nor did they concern the negotiations between the parties or the conduct of any of the parties. We have carefully examined each of the instances in which it is claimed the court so erred, and are of the opinion that not only was the trial court correct in its rulings, but that the substance of the matter stricken was later received in evidence through answers to other questions. Appellants were therefore not prejudiced by the rulings of the court even though they might be found to have been erroneous.

Upon the plaintiffs being called as witnesses on their own behalf, they were asked in substance whether or not they would have sold a 15 per cent for $500, if the sale had been unconnected with the loan of $35,500 [$27,500]. Appellants assert that the trial court erred in sustaining objections to these questions. There is no merit in this claim. The state of mind of the plaintiffs was not in issue or relevant to any issue. The questions were as to a purely hypothetical set of facts. There was no evidence that the parties ever considered or discussed such a sale as that hypothesized. The evidence is uncontradicted that each of the deals in question was a

package deal covering the loan and the alleged sale. The package was wrapped up in the "Assignments." Affirmative answers to the questions propounded would not have tended to prove that the defendants intended to exact usury or that the sale evidenced by the face of the instruments executed pursuant to the assignment was not in fact a sale but a cloak behind which the true transaction was hidden. Plaintiffs might have been unwilling to sell under the facts recited in the question, and still have been willing to sell under the circumstances shown by the evidence.

The judgment on the cross-complaint. In the second action the defendant Leslie filed a cross-complaint for an accounting and for money due and owing. The trial court rendered judgment in his favor for the sum of $185.65, the amount prayed for. By this cross-complaint Leslie alleged in substance that the cross-defendants, the plaintiffs, were joint adventurers doing business under the fictitious name of Marted Productions and were the owners of the proposed television series and that the cross-complainant was the owner of 8 per cent of all of the net profits theretofore or thereafter derived from the proposed television series; that the said television series had been successfully produced and that substantial net profits had been realized in an amount unknown to the cross-complainant, but that cross-complainant had been paid no part of that profit; that he had demanded an accounting but that the cross-defendants refused to account or to pay him his share of the profits. By a second cause of action he alleged that defendants were indebted to him in the sum of $185.65, for monies loaned and advanced. He prayed for an accounting and for judgment in the sum above mentioned, plus his share of the profits as found by the accounting. The trial court found that the series of motion pictures had not been successfully produced; that the cross-defendants had not realized a net profit from the venture; that cross-defendants were indebted to cross-complainant for the sum of $185.65, on account of monies loaned, and rendered judgment in favor of cross-complainant. This judgment cannot be sustained.

The cross-complainant was, under uncontradicted evidence, a joint adventurer, if not a general partner with the cross-defendants. The evidence shows without conflict the following facts: February 1, 1952, cross-complainant drafted an agreement in letter form between himself and the partnership. By this letter it was recited that Leslie had rendered legal and other services to the partnership; that he agreed to act

as attorney for the partnership and to render any and all legal services which might be required by it, other than those involving accounting or tax problems. That in consideration for all the services theretofore rendered or to be rendered, the partnership agreed to pay him a sum equal to 15 per cent of all the net profits derived by or accruing to the partnership from the distribution of the television series; that all profits payable to the partnership should be divided and apportioned 42½ per cent each to Marted and Kneeland, 15 per cent to Leslie. Further, by the terms of the agreement the cross-defendants assigned to Leslie 15 per cent of all assets and profits "now owned or which may be hereafter acquired by Marted Productions," and further agreed that all ventures and transactions in the motion picture, television or radio field by Martyn or Kneeland should be conducted through the partnership. It further provided that nothing contained in the agreement should be "termed to constitute or create a partnership." Leslie's percentage was later increased to 20 per cent, and later still, as we have shown, was reduced to 8 per cent.

In his answer to plaintiffs' complaint, Leslie construed this agreement, for in paragraph I of his answer he alleges that by virtue thereof he became and remained a joint venturer with plaintiffs.

The evidence further shows that during the production of the last picture of the series and after the consummation of the transactions out of which the second action arises, the partnership became short of funds and that Leslie, at the request of his coadventurers, deposited in the account maintained by him and them the sum of $712.50, to cover an overdraft. Of this amount he was repaid all of his advance except the amount for which the court gave him judgment.

While in the written agreements between the parties there is no mention of a sharing of losses, this is implied (*Constans* v. *Ross*, 106 Cal.App.2d 381, 389 [235 P.2d 113]), and the declaration in the contract that it should not be deemed to create a partnership does not change the legal status which it in fact creates. (*San Joaquin L. & P. Corp.* v. *Costaloupes*, 96 Cal.App. 322, 330-336 [274 P. 84].)

A partner or joint adventurer is not entitled to sue the other members of the partnership or venture at law until an accounting has been had, and it has in fact been determined that they are indebted to him. Here, admittedly, there has been no accounting and it has not been determined whether

the venture resulted in a loss. Until that has been determined there is no basis for the finding that the cross-defendants are indebted to the cross-complainant. (*Cunningham* v. *de Mordaigle,* 82 Cal.App.2d 620 [186 P.2d 423]; *Danelian* v. *McLoney,* 124 Cal.App.2d 435, 441 [268 P.2d 775]; *Stowe* v. *Matson,* 94 Cal.App.2d 678 [211 P.2d 591].)

The judgments in each action against the plaintiffs upon their complaints and in favor of the defendants are affirmed. The judgment in the second action in favor of the defendant and cross-complainant Leslie upon his cross-complaint is reversed. The defendants will recover their costs against the plaintiffs; the cross-defendants will recover costs against cross-complainant Leslie in an amount equal to one-fourth of the amount expended by them in the preparation of their brief, the reporter's transcript and the clerk's transcript in Appeal Number Civil 20787.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 5, 1956.