443 P.2d 473

L. A. BOYD, Plaintiff-Appellant and
Cross-Respondent,

v.

W. N. HEAD and Viola N. Head, husband
and wife, Defendants-Respondents
and Cross-Appellants.

No. 10072.

Supreme Court of Idaho.

July 2, 1968.

Goodman & Duff, Rupert, for appellant.

Rayborn, Rayborn, Webb & Pike, Twin
Falls, for respondents.

McQUADE, Justice.

This action arose out of an agreement
executed March 14, 1963, between the par-
ties concerning the sale of ranch property
owned by respondents and cross-appellants
W. N. and Viola Head. Generally, the
agreement provided that if the property
was not "sold" for a price of $73,000.00 or
more "by" September 14, 1965, Heads had
to sell it to appellant and cross-respondent
Boyd who was obliged to buy the property
for $63,000.00 (Boyd terms this arrange-
ment a "must-buy option.") Simultaneously
with execution of the agreement, Boyd loan-
ed Heads $16,000.00, payable with eight
per cent interest in three years, to enable
them to redeem their ownership interest un-

der a previously foreclosed mortgage on the ranch property.

Sometime after September 14, 1965, there still had been no completed sale of the property. Boyd then insisted unsuccessfully that Heads convey the property to him and upon their refusal he brought the present action for specific performance of Heads' obligation under the agreement. Heads answered that (1) the property had been sold within the terms of the agreement before September 14, 1965, and (2) the agreement was tainted with usury and so could not be enforced in equity. Heads also counterclaimed for usury penalties.

The district court found that (1) there had been no "completed sale" prior to September 14, 1965, and (2) the agreement was not tainted with usury. But the court further found that the "must-buy option" was part of a joint venture agreement between Boyd and Heads to attempt to sell the property to some third party for $73,000.00 or more within the allotted time and if successful to share equally in the overplus above $63,000.00. And although both parties would profit upon such a sale, the court found:

> "there is some evidence that the plaintiff [Boyd] did not cooperate as fully as he might [sic] with Mr. Head in working out a sale under the terms of their joint adventure agreement,"

and the court concluded that in the circumstances it would be "inequitable to construe" the agreement "to require that all details of sale be completed and the sale closed and the purchase price paid prior to September 14, 1965."

Implicitly finding that certain contractual arrangements for sale of the property entered into just before September 14, 1965, between Heads and a third party satisfied the court's equity-fashioned interpretation of the Boyd-Heads agreement, the court ordered that Heads have ninety (90) days from March 24, 1967, (original judgment is dated April 6, 1967) to "complete a sale"

of the property. In its findings supporting the order the court stated: "the actions of the parties subsequent to September 14, 1965 had prevented final closing of said sale." In this regard, Boyd admitted he had let it be known to all interested parties that he considered himself the rightful owner of the property as of September 14, 1965, and that he intended to assert his rights. This of course clouded the title.

Boyd appeals, contending the district court erroneously refused to grant unconditional specific performance in accord with his complaint; Heads cross-appeal, assigning error to the court's findings regarding usury. Finding no error in either determination, we affirm the district court's judgment.

Although certain points involved in the usury question are pertinent also to the specific performance issue, for clarity the appeal and cross-appeal will be separately discussed. A more detailed statement of pertinent facts will be presented in each discussion.

## SPECIFIC PERFORMANCE

Boyd's appeal questions whether the order extending Head's time beyond the agreement date to complete a sale of the property was within the district court's equity powers.

The Boyd-Heads agreement, termed an "Agreement and Option" was dated March 14, 1963. It states in pertinent part that if Heads' ranch property was "not sold, as herein provided, by the 14th day of September, 1965," Boyd was obliged to purchase it ("hereby agrees to purchase") and Heads were obliged to sell it to him ("hereby agree to sell") for $63,000.00 cash less assumable encumbrances and the loan created debt of $16,000.00 (plus accrued interest) owed to Boyd by Heads. Besides property description, the only terms of sale "herein provided" were: the property "will be listed for sale for a sum agreed upon[1] by the parties hereto and in an amount not less than

---

1. It appears from the record that the parties at all times have treated the $73,000.00 figure as a fixed acceptable minimum sale price.

$73,000.00. The parties of the first part (Heads) agree that they will, upon receipt of a bona fide cash offer of the said $73,000.00, or more, on or before the 14th day of September, 1965, sell said property." Upon such a sale, the agreement further provided, Boyd and Heads would divide equally the net proceeds exceeding $63,-000.00.

At the end of summer 1965, W. N. Head pursued negotiations with William R. Burt, president of the Deer Creek Company that operates a ranch at Hailey, Idaho, and with another Hailey-Bellevue area rancher, named Arkoosh. Burt was interested in purchasing property owned by Arkoosh and Arkoosh desired to acquire Heads' ranch property. These three—W. N. Head, Burt, and Arkoosh—had several discussions at the end of summer 1965 concerning how and on what terms to accomplish the contemplated exchanges. It was determined that technically Burt would purchase Arkoosh's property and then Arkoosh would use the funds received from Burt to buy Heads' property.

It appears from the record that a few days before September 14, 1965, probably on September 9, 1965, W. N. Head, Burt, and Arkoosh reached some agreement on the final details of the three-way sale or exchange and these final arrangements were transcribed stenographically and the stenographer's pad was then initialed by the Heads, Burt, Arkoosh and perhaps also by some other persons. The initialing of this agreement was not acknowledged before a notary. Just before September 14, 1965—perhaps only the day before—Boyd received a handwritten letter from W. N. Head informing that Head had sold the property for an amount exceeding $73,000.00.

Boyd evidently was not convinced that Heads had sold the property within the requirements of the Boyd-Heads agreement. For shortly—if not immediately—after September 14, 1965, Boyd inquired of the persons interested in the purported three-way sales agreement for sale entered on September 9, 1965, concerning the terms of that agreement. In these discussions and in other ways Boyd unmistakably let it be known that he thought he had paramount right to Heads' ranch property and that he would insist upon enforcing that right. Boyd's testimony contains the following:

"Q. Did you suggest * * * that you might bring a lawsuit to enforce your right to acquire this property?

*    *    *    *    *    *

"A. Well I think it was pretty common knowledge. We notified anybody that was connected with the thing of our intention to consummate this contract [the Boyd-Heads agreement] and file suit accordingly."

September 16, 1965, Boyd posted a cashier's check payable to Heads for $5,000.00 with a real estate agent who then advised Heads that Boyd was prepared to consummate a purchase under the Boyd-Heads agreement of March 14, 1963. Heads refused and several months later Boyd commenced legal action to force conveyance of the property by Heads to him.

From the record it appears that the September 9, 1965 Heads-Burt-Arkoosh agreement, which the district court termed a "sales agreement for sale," detailed thoroughly and precisely the terms and conditions of that intended transaction. Burt testified (by deposition) that the substance of the transaction had been negotiated and detailed terms drafted by attorneys before September 9, 1965, and on that day Heads, Burt, and Arkoosh met in the Gooding, Idaho, office of the attorney, Charles C. Shaw, "for the purpose of signing the documents." "Two or three points, * * * very minor" caused disagreement, Burt said, but these points were soon resolved and Burt dictated this accord, those present signing the stenographer's book. "Considering together the draft of the contract which had previously been prepared and the [dictated] notes," Burt said, all details of the three-way agreement for sale were included: "there was nothing undecided—nothing." W. N. Head testified similarly. The formal agreement of exchange was

typewritten sometime after the September 9, 1965 meeting (apparently before December 1965) but it refers back to the earlier agreement: "THIS AGREEMENT, entered into as of the 9th day of September, 1965, * * *." The initialed stenography book was not introduced in evidence, but there was testimony that it had been lost.

The district court found:

"Head[s] waited until the last possible day to work out a sales agreement for sale under the joint adventure agreement" and that there was no "completed sale of the property prior to September 14, 1965." But the court further found:

"some evidence that the plaintiff [Boyd] did not cooperate as fully as he might with Mr. Head in working out a sale under the terms of their joint adventure agreement * * *.

*  *  *  *  *  *

"That each of the parties acted without due consideration of the joint adventure and that under the circumstances of the cases [sic], it would be unequitable and unconscionable to require a strict compliance of a completed sale by September 14, 1965."

The court concluded:

"That because of the actions of the parties and all of the circumstances of this case, it would be inequitable to construe the language in the Agreement and Option entered into between the parties in such a manner as to require that all details of the sale be completed and the sale closed and the purchase price paid prior to September 14, 1965."

"Under the circumstances," the court found in its disposition of this part of the action,

"90 days from the 24th of March, 1967 [original judgment is dated April 6, 1967], would be a just period * * * to be granted the defendants Head to complete their contract of sale [under the September 9, 1965 three-way sales agreement for sale],"

and the court concluded that:

"Because of the fact that the actions of the parties subsequent to September 14, 1965, had prevented final closing of said sale, the defendants should be granted 90 days from March 24, 1967, within which to complete a sale of property [either under the sale agreement of sale or if that had fallen through some other acceptable sale]."

If such sale were not completed, the court ordered, Boyd was entitled to specific performance of Heads' obligation to convey the property under the Boyd-Heads agreement.

■ We find no abuse in the exercise of the district court's equity power in the court's conditional order on the specific performance issue. The court did not "remake" impermissibly the Boyd-Heads contract, as Boyd contends, but rather—as the court expressly characterized its conduct— the court "construed" the agreement with an eye to the equities of the situation.

First, it will be remembered that although the Boyd-Heads agreement required the property be "sold, as herein provided," nevertheless the term "sold" was not further defined in the agreement. By one of the agreement's terms, however, Heads "agree that they *will, upon receipt of* a bona fide cash *offer* * * * *on* or before *the 14th day of September, 1965, sell* said property." (Emphasis supplied.) The quoted term strongly implies that the undefined term "sold" did not import a thoroughly completed sale by September 14, 1965.

■ Second, the district court characterized the business arrangement under the Boyd-Heads agreement as a joint adventure (or joint venture) and found that Boyd (and Heads) "acted without due consideration" of it. Heads challenge the correctness of the joint adventure characterization insofar as it effects resolution of the usury issue. The economic incidents under the Boyd-Heads agreement are considered at length in our discussion of the usury issue; for present purposes we hold the

court's finding that the Boyd-Heads agreement constituted a joint venture is adequately supported by the evidence.[2] Although joint adventurers stand in fiduciary relation to each other,[3] the record contains several indications that Boyd did not act at all times in the best interests of the joint adventure. For example, there was evidence that though Boyd was supposed to attempt to find a buyer for the property he did not use his best efforts in trying to fulfill this responsibility. Boyd testified that he had no contact with Heads from March 14, 1963 until September 13, 1964 (W. N. Head's handwritten letter) except "when the interest, when it was due."

In circumstances where an order for specific performance would operate to benefit the petitioner inequitably and unconscionably, a court of equity has discretion to refuse to order specific performance or where possible to condition an order for specific performance so as to account for the petitioner's inequitable conduct.[4] In the present action, we cannot say the district court abused its equitable discretion in its "construction" of the Boyd-Heads contract and in the court's conditional order for specific performance.

As an alternative remedy to specific performance, Boyd sought damages in the district court on the theory that because interest rates had risen between September 14, 1965 and the time of trial it would cost more after trial to finance his purchase of Heads' ranch property than if they had conveyed it to him on September 14, 1965. The district court did not award damages. In its order denying unconditional specific performance, the district court ruled in effect that on account of equitable considerations Boyd was not entitled on September 14, 1965 to force immediate conveyance to him of Heads' ranch property. Consequently, it was beside the point that interest rates might have risen since that date. And because we have affirmed the court's order denying Boyd unconditional specific performance, we need not consider Boyd's contentions with respect to damages. Likewise, our decision in this regard disposes of Boyd's contentions concerning sharing of the leasing revenues until the property is sold.

### USURY

Simultaneously with execution of the Boyd-Heads agreement on March 14, 1963, Boyd loaned Heads $16,000.00 payable with eight per cent interest on or before March 14, 1966. The agreement expressly refers [5] to the loan. Heads contend that over and above the Idaho legal maximum interest of eight per cent, the rights granted Boyd under Boyd-Heads agreement constituted additional interest compensation demanded by him for making the $16,000.00 loan. To support their argument, Heads lean heavily on the circumstances surrounding the loan

2. Cf. Bowden v. Robert V. Burggraf Construction Co., 85 Idaho 44, 375 P.2d 532 (1962); Dunclick, Inc. v. Utah-Idaho Concrete Pipe Co., 77 Idaho 499, 295 P.2d 700 (1956); Stearns v. Williams, 72 Idaho 276, 240 P.2d 833 (1952).

3. Tolmie v. San Diego Fruit & Produce Co., 57 Idaho 631, 68 P.2d 61 (1937); Reid v. Keator, 55 Idaho 172, 39 P.2d 926 (1934); 30 Am.Jur., Joint Adventures, § 48 (1958).

4. Cf. Drong v. Coulthard, 87 Idaho 486, 394 P.2d 283 (1964); Haener v. Albro, 73 Idaho 250, 249 P.2d 919 (1952); Rule v. Pope, 37 Idaho 165, 215 P. 532 (1923); 81 C.J.S. Specific Performance § 89 (1953); 49 Am.Jur., Specific Performance § 58 (1943).

5. "WHEREAS, the party of the second part [Boyd] herein did agree to loan the said parties of the first part the sum of $16,000.00 so that they could obtain an FHA Loan and Mortgage, which would be prior and superior to said second party's loan and Deed of Trust, and with the combined proceeds thereof, redeem said property [Heads' ranch] * * *." But after such recitation the agreement continues:
"NOW THEREFORE, in consideration of the payment of $10.00 by the party of the second part to the parties of the first part, the receipt whereof is hereby acknowledged, and the further consideration of these presents, the parties hereto hereby agree as follows: [whereupon the terms discussed in the usury part of this opinion are set out]."

and agreement. Thus, a review of those circumstances is in order.

During 1917, W. N. Head homesteaded part of the ranch property involved in this action; sometime later he acquired the rest of the property. W. N. and Viola Head intermarried in 1929 and since then continuously have lived on the ranch, operating it themselves. Derris Head, apparently their only child, has lived on and assisted them with the ranch since his birth.

A mortgage on the ranch property was foreclosed on March 17, 1962; the amount required to redeem was about $40,000.00 and the right of redemption was to terminate on March 17, 1963. As the year of redemption was drawing near a close, Heads had been able to locate only a $25,000.00 federal "distress" loan. Meanwhile, however, through a real estate broker they received an offer to purchase their ranch for $63,000.00 (less encumbrances).

Early in March 1963, one Wayne Johnson, whose wife was Viola Head's niece, brought L. A. Boyd to Bellevue and put him in touch with W. N. Head. Johnson was friendly with Boyd and at that time he operated a bar which had been financed in part by Boyd. Johnson knew that Boyd was a real property entrepreneur and he hoped that Boyd might be able to help Heads out of their predicament.

When Boyd and W. N. Head began seriously to discuss financing arrangements whereby the Heads could continue their ownership of the ranch property, Heads felt sure that their property was worth more than $63,000.00, their best offer to date, but the end of their redemption year was fast approaching. In these somewhat urgent circumstances, Boyd and the Heads' worked out an arrangement which as formally drafted a few days later by an attorney provided as follows. Boyd would loan Heads $16,000.00 (which when added to the available $25,000.00 federal "distress" loan would enable Heads to exercise redemption rights) at eight per cent interest, payable in three years. The property would be redeemed and during the next thirty (30) months the parties would try to sell it for a minimum price of $73,000.00. If such a sale were accomplished, Boyd and Heads would split evenly the net proceeds above $63,000.00. The agreement gave Heads exclusive rights to remain in possession of the property and to receive the entire revenues from leasing its grazing rights until the property was sold or if not sold for the whole thirty-month period. If the property remained unsold at the end of the thirty-month period, Heads had to sell it to Boyd who was obliged to buy it for $63,000.00.

It should be noted here that the Boyd-Heads agreement originally was handwritten—penned by Boyd at 3:00 a. m. on a Monday in Heads' dining room—several days before the formal attorney-drafted agreement discussed in the preceding paragraph. This written agreement accorded Boyd the right but did not oblige him to purchase Heads property for $63,000.00 if it were not sold as agreed within thirty months. However, Boyd testified that he had made an error when he wrote the agreement. As the parties worked out their agreement, Boyd said, W. N. Head had "insisted we [Boyd] must purchase it [the property] if it were not sold" and Boyd had so agreed. He testified that he then had "attempted to make a rough draft" memorandum of the agreement and by it he intended to be obligated to purchase: "At the time I wrote it, this was our agreement that I must purchase it and he must sell it." Boyd testified that when his attorney drafted the formal agreement, which obliges Boyd to purchase, he "drew it as it stands today and as we [Boyd and Heads] had agreed."

Corroborating Boyd's testimony on this point, Wayne Johnson testified Boyd and Heads had agreed when Boyd wrote the memorandum that:

"Boyd had to buy the ranch. Mr. Head insisted if they didn't sell it for a profit at the end of three years [thirty months?], Boyd would have to buy it if

there wasn't any—what I am getting at—if he was going to sell it, he might as well sell it at the time rather than gamble the three years."

And W. N. Head's testimony contains the following:

"Q. The time of [sic] the written agreement, Plaintiff's Exhibit 3 [memorandum of Boyd-Heads agreement handwritten by Boyd], was signed, was there any discussion of sale of the ranch to Mr. Boyd?

"A. Yeah, I tried to sell it to him right then.

"Q. And did you come to an agreement basically if the ranch wasn't sold in two and a half years, Mr. Boyd would buy the ranch?

"A. I don't know if I put anything in that way for sure.

"Q. If you weren't able to sell this property, Mr. Boyd had to buy it, didn't he?

"A. Is that what the paper says?

"Q. I am asking you.

"A. I am standing on that paper.

"Q. I am asking you,

"A. I can't—just what it says."

As will be illustrated subsequently in this opinion, our decision upholding the district court's finding of no usury depends in large part on the fact of Boyd's obligation to purchase the ranch property. Heads strongly contend that Boyd initially agreed —as evidenced by the handwritten agreement—only that he would have the right to purchase and that his attorney later convinced him to become obliged to purchase in order to camouflage his usurious intent. But considering the evidence just discussed, we cannot say as a matter of law that the record compels such an interpretation.

Next, we note that a major part of Heads' evidence directed to the usury issue was testimony concerning alleged statements made by Boyd to Heads in which Boyd described the Boyd-Heads agreement as a device to evade the usury laws. However, there is sharp conflict on this point.

W. N. Head testified that while the parties were working out their business transaction Boyd had said he would require a "profit" of $10,000.00, which amount he later lowered to $5,000.00, for lending $16,000.00 to the Heads. Boyd then said, according to W. N. Head, that "he would have to cover up from the banking laws the extra money that was involved in it." Viola Head and Derris Head corroborated W. N. Head's testimony. It should be noted that W. N. Head's credibility was impeached by the testimony of several of his neighbors.

Boyd, on the other hand, denied having mentioned or having discussed "banking laws" or usury with Heads. Boyd testified he told Heads he "wasn't interested in loaning him the money for the time it would be tied up * * * I positively told him [W. N. Head] I would not be interested in loaning him the money, period. And I don't think any other individual would be." Boyd said that after he so informed Heads, he and Heads "discussed whether or not it was advisable to attempt to go into a business venture which would ultimately, possibly, show us both a profit." Certain testimony of Wayne Johnson is corroborative of Boyd's statement.

Examination of the formally-drafted agreement reveals economic advantages both to Heads and to Boyd. To Heads' advantage, they were guaranteed a purchase price of $63,000.00 for their ranch property which amount would net them about $3,000.00 more than their best offer to date (also $63,000.00 but less a real estate brokerage commission). They were entitled to live on and lease the property after the agreement for thirty (30) months or until it was sold, and from past experience it appeared that leasing rights could have earned for them as much as $15,000.00 over a thirty-month period.

To Boyd's advantage, he would receive 50% (a minimum share of $5,000.00) of

the overplus above $63,000.00 if the property were sold during the prescribed thirty-month period but even if not, Boyd might still profit *if* the property, which he was obliged to purchase for $63,000.00 was worth more than that amount when he had to buy it. Nevertheless, the possibility that thirty months after the agreement the value of the property might be less than $63,000.00, which amount was to date of the agreement the best offer received by Heads, was a definite risk of loss to Boyd. In effect Boyd acted as an insurer. As he testified: "Mr. Head was guaranteed he would show a profit and I could have stood a loss * * * he was protected and I was not."

Heads contend that in fact Boyd never contemplated any risk of loss because allegedly, as they attempted to establish at trial, the property's value was more than $63,000.00 at all pertinent times and Boyd knew this upon entering the agreement and he had not the slightest doubt that the property would be worth more than $63,000.00 at the end of the thirty-month period. There was some evidence on this point. For example, Boyd admitted the obvious, that he thought the property was worth at least $63,000.00 when he entered into the agreement and that he hoped in any event to make a profit on his deal with Heads. Wayne Johnson testified: "it seemed to be the [Boyd and Heads] feeling" that the property was worth from $75,000.00 to $100,000.00 at the time of the agreement, "but I am no authority on that." However, the evidence does not approach a level of any certainty assuring that the property was—and perhaps more importantly would somehow remain in all contingencies—worth more than $63,000.00 so as to denude Boyd's obligation of its risk.

Examination of this court's opinions dealing with usury reveals that the present action is the first in which we have been asked to determine whether an ostensibly separate commercial transaction entered simultaneously and with reference to a loan agreement has tainted the loan with usury. Because of the obviously delicate nature of this question and because this court "will never hesitate to pierce a devious device or form which seeks to circumvent the usury law,"[6] we have studied the record closely and have searched extensively for pertinent authority. We have discovered no case involving a transaction identical to that of present concern, but several courts have passed upon essentially similar transactions.[7]

---

6. Meridian Bowling Lanes, Inc. v. Brown, 90 Idaho 403, 415, 412 P.2d 586, 593 (1966) (dictum). Accord Freedman v. Hendershott, 77 Idaho 213, 290 P.2d 738 (1955); cf. O'Malley v. United States Bldg., etc., Assn., 50 Idaho 583, 298 P. 675 (1931); see also Cornelison v. United States Bldg., etc., Assn., 50 Idaho 1, 292 P. 243 (1930); McDougall v. Kasiska, 48 Idaho 424, 282 P. 943 (1929); Madsen v. Whitman, 8 Idaho 762, 71 P. 152 (1902); cf. Stevens v. Home Sav., etc., Assn., 5 Idaho 741, 51 P. 779, 986 (1898).

7. The following cases found no usury in transactions which we deem for the purposes of the usury question more or less analogous in economic substance to the transaction of present concern. Sulger v. Maslin, 90 Ariz. 70, 365 P.2d 1113 (1961); Johnson v. Chicot Bank & Trust Co., 128 Ark. 640, 194 S.W. 29 (1917); Klett v. Security Acceptance Co., 38 Cal.

2d 770, 242 P.2d 873 (1952); Martyn v. Leslie, 137 Cal.App.2d 41, 290 P.2d 58 (1955); Harrison v. Arrendale, 113 Ga.App. 118, 147 S.E.2d 356 (1966); Griffin v. New Jersey Oil Co., 11 N.J. Eq. 49 (1855); McCullough v. Snow, 78 N.M. 455, 432 P.2d 811 (1967); Clarke v. Sheehan, 47 N.Y. 188 (1872); Hall v. Ditson, 55 How.Pr. 19, 5 Abb.N.C. 198 (N.Y.1878); Salter v. Havivi, 30 Misc.2d 251, 215 N.Y.S.2d 913 (Sup.Ct.1961); Bokser v. Lewis, 383 Pa. 507, 119 A.2d 67 (1956); cert. den. 351 U.S. 965, 76 S.Ct. 1031, 100 L.Ed. 1485 (1956). See generally Annot., Payments Under (Ostensibly) Independent Contract As Usury, 81 A.L.R.2d 1280 (1962); 55 Am.Jur., Usury, §§ 55 et seq. (1946). It is also the rule that loans made in consideration for a share of earnings in lieu of fixed interest compensation are not subject to usury if there is any risk that the transaction will not result in an excessive return to the lender. Owens v.

■ The common principle emerging from these opinions may be summarized: the collateral transaction does not taint the loan with usury if the transaction is entered without usurious intent and is supported by an adequate or fair consideration separate and distinct from the loan agreement. Thus, the courts have investigated the collateral transaction between the borrower and lender to determine if it contained a "fair price * * * full compensation [and] * * * equivalent benefit,"[8] if it was "not unfavorable"[9] to the borrower but rather was "mutually beneficial,"[10] and if it was supported by independent consideration which was "ample,"[11] "adequate and commensurate."[12] Obversely, in order to answer this question, the courts have analyzed the economic incidents of the collateral agreement to determine if it offers relatively substantial advantages to the borrower. If the agreement benefits equivalently the borrower and the lender, the courts when determining whether the accompanying loan is usurious refuse to treat the collateral advantages accorded the lender as interest compensation or extra payment on account of the loan.[13] And because the question of relative or equivalent economic advantage is a matter of fact, appellate courts defer to findings based on substantial evidence.[14]

■ Upon examination, the collateral transaction of present concern—the Boyd-Heads agreement—readily discloses independently of the loan substantial benefits flowing from Boyd, the lender under the separate loan agreement, to Heads, the borrowers. Heads were accorded certain use of and income from the property, and a potential saving of real estate commission. Also, and perhaps most importantly, they were assured of a purchase price thirty months hence exceeding their best offer to date. This assurance must be recognized as valuable unless somehow there was not the slightest possibility that the property's true value might be less than $63,000.00 at the maturity of Boyd's "must buy" option. As mentioned above, the record does not convince us that there was no such possibility.

Finding substantial evidence supporting the district court's determination concerning usury, we affirm. Costs to respondents.

SMITH, C. J., and TAYLOR, McFADDEN and SPEAR, JJ., concur.

Conelly, 77 Ariz. 349, 272 P.2d 345 (1954); Dublin v. Veal, 341 S.W.2d 776 (Ky.1961); Hirsch v. Smith, 262 Wis. 75, 53 N.W.2d 769 (1952); Mueller v. Brennan, 68 N.Y.S.2d 517 (Sup.Ct.1947); and cases cited in Annot., 51 A.L.R. 552, 558 (1927); see Usury Laws: Loans for a Share of the Profits, 42 Cal.L.Rev. 198 (1954); cf. Colagrossi v. Hendrickson, 50 Wash.2d 266, 310 P.2d 1072 (1957); cf., Jameson v. Warren, 91 Cal. App. 590, 267 P. 372 (1928).

8. Clarke v. Sheehan, supra n. 7.

9. Hall v. Ditson, supra n. 7.

10. Bokser v. Lewis, supra n. 7.

11. Ibid.

12. Sulger v. Maslin, supra n. 7. Accord Martyn v. Leslie, supra n. 7; cf. Johnson

v. Chicot Bank & Trust Co., supra n. 7, ("not grossly inadequate consideration"); Harrison v. Arrendale, supra n. 7, ("Good and valuable consideration"): McCullough v. Snow, supra n. 7, ("valid consideration"); cf., Fred G. Clark Co. v. E. C. Warner Co., 188 Minn. 277, 247 N.W. 225 (1933), (absence of "fair compensation" fatal).

13. Restatement, Contracts § 528 (1933).

14. E.g. Harrison v. Arrendale, supra n. 7; Sulger v. Maslin, supra n. 7; cf. Smith v. Sherwood & Roberts, Spokane, Inc., 92 Idaho 248, 441 P.2d 158 (May 2, 1968) (reh. den. June 11, 1968); Meridian Bowling Lanes, Inc. v. Brown, supra n. 6.