(No. 5295. November 29, 1929.)

ISAAC McDOUGALL, Trustee in Bankruptcy of the Estate of XAVIER SERVEL, Bankrupt, Respondent, v. W. F. KASISKA, Appellant.

[282 Pac. 943.]

Holden & Coffin and Hawley & Hawley, for Appellant.

Bissell & Bird, for Respondent.

. T. BAILEY LEE, J.—On October 10, 1925, Xavier Servel and Julia, his wife, residents of Pocatello, Bannock county, Idaho, made and delivered to W. F. Kasiska, defendant and appellant herein, their promissory note in the principal sum of $35,000, payable one year thereafter, and bearing interest at the rate of 8 per cent per annum. To secure this note, together with such additional advances as might from time to time be made, the makers executed to defendant their chattel mortgage upon 5,000 ewes then situate in Cassia county, branded (ΘJS) in black paint on backs, and thereafter to be ranged in Power, Cassia and Bannock counties.

On the same day the makers also made and delivered to defendant their promissory note in the principal sum of $46,000, payable one year thereafter, and bearing interest at the rate of 8 per cent per annum. This note was likewise secured by chattel mortgage upon 4,800 ewes and 500 bucks situated in Bannock county, branded (ΘJS) in black and red paint on backs. Subsequently, on April 24, 1926, the makers made and delivered to defendant their two promissory notes, respectively, in the principal sums of

$35,000 and $50,000, due six months after date, and bearing interest at the rate of 10 per cent per annum.

As in the former instances, the notes and future advances were secured by a chattel mortgage. This particular mortgage covered 9,500 ewes situate in Bannock, Bingham and Cassia counties, all branded (JS). All three mortgages were duly recorded.

The Servels defaulted in the payment of the three mortgages, and in January, 1927, the defendant, claiming that many of the sheep had been disposed of, brands changed and different bands intermixed and commingled, endeavored to foreclose all three mortgages in one summary proceeding under C. S., sec. 6380 et seq. Defendant's attorney, on January 8, 1927, prepared and executed a blanket affidavit in foreclosure, setting up said notes and mortgages, but wholly failing to designate the respective amounts due under each; the total amount claimed due being the sum of $113,471.40, together with interest thereon at the rate of 10 per cent per annum from November 1, 1926, and an attorney's fee of $11,000, which, exclusive of interest charged, aggregated the expressed sum of $124,471.40.

Armed with such affidavit, B. Thos. Morris, as the agent of defendant, on or about January 10th, proceeded to the office of P. D. Pace, sheriff of Cassia county, and placed the same, together with a notice of sale in the latter's hands; whereupon said officer subscribed his official signature to said notice and dispatched his deputy, Steve Mahoney, along with Morris, "to seize" the sheep. On January 11th they arrived at the Ellis Ranch, in Cassia county, where they found a band of the Servel sheep in care of two Basques. What next ensued is best related by the deputy:

"Q. And you went up and told the sheepherders who you were, didn't you? A. Well, no. Mr. Morris introduced himself first, and told them what he was there for, and myself too.

"Q. Said you were the Sheriff? A. Yes, sir.

"Q. And you had come out to get those sheep? A. Yes, sir.

"Q. And then after the sheepherders turned the sheep over to Mr. Morris and you as Deputy Sheriff— A. Yes, sir.

"Q. You gave back the affidavit to Mr. Morris, didn't you? A. Yes, sir."

He had already testified as follows:

"Q. And at the time you got, or by the time you got out to the Ellis Ranch, you had those papers in your pocket and a notice from the Sheriff? A. Yes, sir."

He later qualified this by saying:

"I could not say whether I had it in my pocket or not, or in his. Right now I can't say whether he had it or I had it."

The sheep were surrendered; and, according to the deputy, Morris, at the former's request, scratched from the notice of sale the already subscribed signature of Sheriff Pace, and in lieu thereof appended his own, as defendant's agent. Morris admitted signing as agent, but insisted that the deputy struck out the sheriff's name, himself.

Like procedure was had on the same day with another band at Bridge in the same county. The sales were noticed for January 17th, and Morris recited in his return that, not having been able to find the Servels in Cassia county, he "presented" the affidavit on foreclosure to the herders in charge, demanding the sheep, and that the herders "thereupon" delivered them to him, and that "thereupon" he delivered said herders the notice of sale. Both bands were bid in by defendant, the one at the Ellis Ranch for $11 per head and the one at Bridge for $9.75. The following occurrence at the latter sale was testified to by the witness Ward, one of the attending bidders at such sale, who had bid $10 per head:

"Q. At that time did you make a bid on those sheep? A. Yes, sir. I think I did.

"Q. What, if anything, did Mr. Kasiska say regarding the bid which you made on the sheep? A. Why, when I bid, he asked me if I had a certified check or a cashier's check, I believe that was it, a check, cashier's check, or the currency to pay for those sheep.

"Q. What, if anything, did you tell him? A. I told him I had not.

"Q. Then what was the conversation? A. Well, I withdrew my bid. . . . .

"Q. Did you afterwards buy this band of sheep from Mr. Kasiska? A. Yes.

"Q. What did you pay Mr. Kasiska for these sheep? A. $12.50.

"Q. When did you buy them? A. Well, I couldn't state positively, but it was about ten days, two weeks afterwards that Mr. Kasiska called me, and I agreed to take the sheep."

On January 11th, one Byington, acting under the same affidavit as B. Thos. Morris, found a band of sheep in Oneida county near Stone. He also, having failed to locate the Servels in that county, "presented" the affidavit to the herders in charge, demanding possession. Said herders "thereupon" delivered the sheep to Byington, who delivered the former a notice of sale for the 17th ensuing. At this sale the sheep were bid in by defendant for $8 per head. The record discloses that approximately two months later most of these sheep were sold to a company formed for the purpose, and composed of Byington, defendant's daughter, and one other, two-thirds for $13.50 and the remainder for $11.50. It is well to note here that the notices fixed the place of sale at Black Pine, whereas, according to the record, the sale was actually had at Stone, 25 miles away by road, and 9 miles by sheep trail across the mountain.

On January 12th, after the operations of Morris and Byington related as of the 11th, defendant's attorney served the heretofore described blanket affidavit upon the Servels in Pocatello, and was met by their refusal to surrender anything; whereupon he sought the sheriff of Bannock county. The latter's deputy forthwith served the Servels with the affidavit and then "took possession" of two bands of sheep near Tyhee. It does not appear that he ever served any affidavit or notice of sale upon those in possession. It seems obvious that the Servels were not in possession, for the deputy's return certifies that he served them in Pocatello,

not at Tyhee. Notices were posted, fixing the sale at 8 A. M. January 20th; and the sale was held at said hour, so the return insists, for a special reason, the defendant bidding in the band at $11.

While the sheep were being noticed for sale, Servel filed his voluntary petition in bankruptcy, showing claims of unsecured creditors in excess of one-half million dollars. Respondent, McDougall, thereafter regularly appointed trustee for the creditors, brought this suit on behalf of the estate, contending that the foreclosures were void, and that defendant had converted the sheep to his own emolument in prejudice of other creditors. The defendant demurred generally, also moving to strike, and later, after an adverse ruling, answered, denying any illegal conduct or conversion, and alleging that defendant and the Servels conducted all their business by means of one general account, never keeping track of any separate indebtedness; that on or about January 8, 1927, they had agreed upon a balance due of $113,471.40, with interest thereon from November 21, 1926, at the rate of 10 per cent per annum (which sum by the addition of some overlooked item was increased by $2,000); that the sheep were without feed, were being neglected in severe weather, were being disposed of without any accounting to the defendant, had been commingled, brands changed so as to prevent identification, were being concealed and removed from the state of Idaho and counties where they were to be ranged, were subject to sheepherders' liens for accumulated back wages; that no provisions had been made by the mortgagors for lambing, and that there was menace of irreparable loss to the defendant mortgagee.

Three further affirmative defenses were urged, to wit: that Xavier Servel, after institution of the bankruptcy proceedings, had filed his petition in the federal court, stating that the defendant had commenced a summary proceeding for the purpose of foreclosing the "mortgages covering all of the sheep listed in the bankrupt's petition," and praying that defendant be restrained from further proceeding until a trustee could be appointed, "and said estate properly ad-

ministered''; that said petition had been thereafter by the court denied, by which adjudication the matter had become *res adjudicata* as to all issues in the instant case, all issues herein having been before the federal court for decision in that proceeding. Second: That plaintiff trustee had waived any rights that he might have had, for the reason that more than six months had elapsed after the date of the last foreclosure sale and before the filing of the complaint. Third: That plaintiff was estopped to maintain the action for the reason that he stood in the position of the bankrupt, and had no greater rights than would the bankrupt himself have had, had bankruptcy not intervened.

Respondent's motion requiring the answer to be made more definite and certain was sustained; and the defendant endeavored to meet such requirement by pleading the impossibility of segregating the indebtedness under each mortgage by reason of the customary method of bookkeeping between the parties. The case was tried before a jury, the defendant allowed to submit proof of not only his claims of direct indebtedness, but also of those indirectly incurred by payment of taxes, back wages and purchases of needed feed. A verdict was rendered in favor of respondent for $41,025.88. Defendant has appealed from the ensuing judgment.

There are 42 assignments of error. We shall discuss only those that we deem meritorious. Primarily, appellant contends that plaintiff trustee is without power to maintain this action, his rights being limited to those formerly possessed by the bankrupt, and creditors holding executions unsatisfied; that, inasmuch as the bankrupt did not, under the provision of C. S., sec. 6385, challenge defendant's right to foreclose, or the amount claimed due, such remedy was waived and cannot now avail plaintiff. This proposition is unsound for two reasons. Irrespective of the statute, every mortgagor has the right of contest, but here the right to foreclose has not only never been questioned, it has been conceded; the attack is not upon the right to foreclose, but upon the method of foreclosure exercised in alleged violation of mandatory statutes. Furthermore, it is the duty of the

trustee as the representative of the unsecured creditors to protect the bankrupt estate against fraud or mistake, notwithstanding what the bankrupt might do or say. No admission or waiver of the bankrupt can operate so as to bind the trustee. Such a rule would tie the trustee's hands in the immediate presence of a venal attempt on the part of the bankrupt to falsify his schedules or surrender rights, to the preferment of some favorite creditor and the utter prejudice of all others. The right of Xavier Servel to attack the method of foreclosure vested in the trustee as of date of January 15th when the former's petition in bankruptcy was filed; and, when on February 2d plaintiff trustee was appointed, it became his duty to do just what he has done; there was no error in overruling defendant's demurrer and motion to strike.

The plea of *res adjudicata* may be dismissed with the observation that the federal court merely upheld defendant's right to foreclose; the manner of foreclosing was never litigated in that tribunal. In instruction No. 5 the trial court advised the jury that the defendant claimed in his answer that Servel owed him a large indebtedness consisting of a number of items; that, before allowing him credit for any item, the burden of proof was upon defendant to satisfy the jury that such item was fairly and justly due, and that the jury was at liberty to disregard any item not so established. Instruction No. 11 advised the jury that, if it should find from the evidence that the defendant and the Servels had kept accounts, and agreed upon the amount due, it could not disregard the amount agreed upon. Appellant insists that their instructions are irreconcilably conflicting. We think not. Defendant had first plead that the account between the parties was a ''general account kept to show the total balance due from the said Julia Servel and Xavier Servel to this defendant.'' In his supplemental answer he plead that the accounts between the parties were ''kept in one general account''; that on January 1, 1925, the parties agreed upon a total balance due defendant of $38,090.44. Yet, notwithstanding such agreement, it appears that such

account was continued as an open, mutual and running account until January 8, 1927, when there was claimed a balance due of $115,874.14. . Construing his pleaded account to have been an account stated, defendant requested that part of instruction No. 11 just recited. But it must be remembered that there was a direct issue on this contention, and that evidence was introduced to disprove it, to wit: On January 8, 1927, over a year and five months before the supplemental answer was filed, defendant's attorney had executed the blanket affidavit on foreclosure in which he claimed a balance due of $113,471.40, making no reference whatever to an account stated, but basing his claim wholly upon four notes and three incident mortgages. The whole foreclosure proceeding was so based, and the bankrupt himself, on January 15, 1927, seven days after the execution of the affidavit, and in apparent confirmation of such theory, listed defendant's claim in his schedules in the same amount. The first mention of or actual showing tending toward an account stated was Defendant's Exhibit 13, never heard of until the cause was reopened after plaintiff's opening argument to the jury. The trial court was faced with two alternatives. The jury had to find whether or not, in fact, there was any account stated, and in case they found that there had been, whether or not it was correct. The court properly instructed on both theories, leaving the determination of the fact to the jury. However, we pause to remark that the instruction so given at defendant's request does not state the law; an account stated is always open to attack for fraud or mistake.

Nor was there any error in the court's instruction as to usury, upon his own motion. While nowhere charged in the pleadings, usury was injected into the case by the defendant's own evidence. Two of the notes expressly limited interest to 8 per cent per annum. But, notwithstanding the positive inhibitions of C. S., sec. 2551, defendant blithely calculated interest at 10 per cent not only upon their principal, but upon overdue interest as well. C. S., sec. 2554, among other things, provided as follows:

"The taking, receiving, reserving or charging a rate of interest greater than is allowed by this Chapter, when knowingly done, shall be deemed a forfeiture of the entire interest which the contract carries with it, or which has been agreed to be paid thereon."

This is a legislative declaration of public policy, which is unequivocal. Whenever, in the process of trial, the statute meets usury, it operates automatically; and the forfeiture is complete, independent of any special pleading by the party entitled to the benefit of such forfeiture. There is no such personal right as a party may waive when public policy is involved. The trial court did only his duty in declaring the law in a proper instance. No right of the defendant was prejudiced, as under the statute that right had already vanished. Furthermore, enough had already appeared in the pleadings and evidence to satisfy the general rule contended for by defendant. (*Jordan v. Warner's Estate*, 107 Wis. 539, 83 N. W. 946, 953; *Hamill v. Mason*, 51 Ill. 488; 39 Cyc. 1040, sec. 2, note 62.)

█ █ A close study of the record discloses so many direct violations of the statutes governing the summary foreclosure of chattel mortgages that we have no hesitancy in upholding the court's instruction that defendant's attempted foreclosures were invalid. This court has heretofore held that the provisions of these statutes are mandatory and must be strictly complied with. (*First Nat. Bank of Pocatello v. Poling*, 42 Ida. 636, 248 Pac. 19.) Here were two notes of even date, one secured by sheep in Cassia county and the other by sheep in Bannock county. Two later notes secured by sheep, a part of which were not included in either of the prior mortgages; separate debts, separate securities, the lien per head in the one instance differing widely in amounts from the lien per head in the others. Yet, all were marshaled in one proceeding where neither the mortgagors, attaching creditors nor other lienors could have possibly been able to ascertain from the blanket affidavit the amount claimed due under any particular note and mortgage. The mortgagors had no choice but to pay the total sum claimed;

they could not have divested the lien of any one mortgage, and at least saved something. To all inquiry as to what each mortgage totaled, both the foreclosing sheriff and the mortgagee's agents must have, under the affidavit and notices of sale, been quite as dumb as the sheep they were selling. It is no answer to say that the bands had been commingled and the brands erased. That gave the defendant only the right to have separate foreclosures on the commingled bands. He could not, after satisfying Peter's lien, appropriate the excess to the satisfaction of Paul's, as was done at the sale of 3,700 head in Bannock county, where there had been neither commingling nor erasing. (C. S., sec. 6380; *Griffin v. Armsted,* 163 App. Div. 934, 147 N. Y. Supp. 1114; *Morse v. Byam,* 55 Mich. 594, 22 N. W. 54.)

The affidavit stated that "there remains due from the mortgagors to the mortgagee on the indebtedness by said mortgages secured at this time the sum of $113,471.40 with interest thereon at the rate of 10 per cent per annum from the 1st day of November 1926." Later on, reciting an agreement between the parties as to an attorney's fee, the affidavit declared that it was agreed "to include therein as counsel fees, $11,000 making the total due on said mortgages, exclusive of the costs of foreclosure, the sum of $124,471.40, together with ten per cent interest on the sum of $113,471.40 from the 1st day of November 1926." This was in accordance with a pernicious practice that has sprung up here and there, due probably more to thoughtlessness than any studied purpose to defraud. The undeviating rule often announced by this court has been that, to entitle one to recover a contracted attorney's fee, the plaintiff must plead and prove the contract for a fee, the amount of the fee contracted for, and that the same is reasonable. (*Porter v. Title Guaranty & Surety Co.,* 17 Ida. 364, 106 Pac. 299, 27 L. R. A., N. S., 111.) Governed by the evidence adduced, the court or jury fixes the fee. If such are the requirements in a formal foreclosure, what shall be said of an *ex parte* practice that permits a mortgagee, his agent or attorney to exercise the functions of judge, witness and jury, and determine, willy-nilly,

the fee for which the mortgagor shall be held in a summary proceeding? The very purpose of summary proceedings is to save the mortgagor court costs and attorney's fees. While the inclusion of this item did not operate to invalidate the process, it was an improper charge certainly affecting the verdict of the jury.

There is no pleading of conspiracy between the bankrupt and defendant to defraud the other creditors; and this court does not by intimation attribute to either of them any such motive. The entire proceeding, however, is so colored with haste, irregularity and disorderly dispatch that we cannot avoid the conclusion that substantial rights have been invaded, and that the jury, having all the facts before it, rendered a verdict that should not be disturbed. Judgment affirmed, costs to respondent.

Givens, Wm. E. Lee, Varian, JJ., and Babcock, D. J., concur.

Budge, C. J., did not sit.

Petition for rehearing denied.