372 P.2d 765

Thomas LENO, Lyle Malone, individually and doing business as Leno & Malone Construction Company, a partnership, Plaintiffs-Respondents,

v.

NORTHWEST CREDIT CORPORATION, Defendant-Appellant.

No. 9059.

Supreme Court of Idaho.

June 22, 1962.

Rehearing Denied July 16, 1962.

Rayborn, Rayborn, Rayborn & Webb, Robert W. Stephan, Twin Falls, for appellant.

Kramer & Walker, Twin Falls, for respondents.

McFADDEN, Justice.

This action was instituted to determine the rights of the parties to payments held by a Twin Falls bank pursuant to their agreement. The trial court decreed respondents were the owners of the $11,845.-00 so held by the bank, being the payment received on Estimate #7 on a contract with the United States Department of the Army; it is from this judgment that this appeal is taken.

Leno and Malone, respondents, are co-partners engaged in the construction business. In December, 1958, they joined with Dale Aslett Sand & Gravel Company, Inc., (for brevity referred to as Aslett) as joint venturers to submit a bid on a proposed contract for construction of levees on the Snake River, contemplated by the Department of the Army. The joint venturers as between themselves allocated the work and payments on certain bid items of the contract to respondents, others to Aslett, the remaining items to be performed by them jointly. After being awarded the contract, a written agreement was executed by the joint venturers providing for all payments to be made to a bank at Twin Falls (other than the one now holding the sums), to be allocated by it in accordance with the work done by each.

In January, 1959, Aslett, to finance his operations, executed a "Conditional Sales Contract" with appellant Northwest Credit Corporation, a finance company (referred to here as Northwest). By its terms Northwest purported to sell to Aslett certain items of equipment for $55,000.00 although all equipment was originally owned by Aslett, excepting one Bucyrus-Erie power shovel. Northwest had actually taken title to this power shovel, although the purchase had been wholly negotiated by the president of Aslett. As a practical matter, the so-called conditional sales contract, which covered this power shovel and other equipment was in fact a device to secure $55,000.00 loaned by Northwest to Aslett. Payments were to be made on this contract monthly commencing in April, 1959. Subsequently Aslett executed two other contracts payable to Northwest, one in February, 1959 for $7,738.96, payable on August 1, 1959 and the other for

$3,000, in June, 1959, payable monthly commencing in July, 1959.

The April and May payments on the $55,000 loan were not made; a meeting between the officials of Northwest and Aslett, resulted in two agreements. These two agreements are considered by all the parties as being part of the same transaction, although one was dated "June —— 1959", and the other June 17, 1959. One of these two agreements was an assignment by Aslett to Northwest of all payments it was to receive under the Army contract, and the other an agreement whereby Northwest was to advance Aslett additional sums, not to exceed $25,000.00.

The assignment by Aslett of its payment under the Army contract was made "as Collateral Security" for the purpose of securing the payment by it to Northwest of the sums due on the first two security contracts in the amounts of $55,000.00 and $7,738.96 principal, respectively, "together with any other indebtedness incurred or to be incurred." This assignment also recited: "It is agreed that said construction contract is assigned and transferred to * *" Northwest " * * * as collateral security only * * *".

The other agreement provided that as needed, and as funds were available, Northwest would loan Aslett additional funds, not to exceed $25,000 as "operating capital"; Aslett agreed to borrow all future operating capital from Northwest, and to assign all future construction contracts as security.

Pursuant to this agreement Northwest advanced additional sums to Aslett as operating capital. Under the June 17, 1959 assignment three payments were made to Northwest. These payments were applied to both the "operating capital" account and to the "conditional sale" account.

Aslett encountered difficulties under its allocated portion of the construction contract, which lead to grave financial problems. The surety company that had bonded the joint venturers on the government contract was apprehensive of the contract, and during August, 1959, another meeting was held. At this meeting there were representatives of the surety company, the president of Aslett, officers of Northwest, and the respondents. The outcome of this extensive meeting was an assignment dated August 25, 1959 by Aslett of its share of the government contract to respondents Leno and Malone, who agreed to complete and comply with all the terms of the contract, they also agreeing to pay all obligations of Aslett for labor and material, and to account to Aslett, upon completion, for any profits that might have arisen from its allocated portion of the contract.

Under date of August 25, 1959, Northwest executed a "Release of Assignment" under which it released all its rights in and to the

previous assignment from Aslett to Northwest dated June 17, 1959; this release, however, contained the following: "EXCEPT this release does not release any or all moneys due for work or labor performed by Dale Aslett Sand & Gravel, Inc., up to and including August 18, 1959, but said moneys or claims for said moneys are hereby specifically reserved to Northwest Credit Corporation."

Under date of August 29, 1959, Aslett and Northwest entered into another agreement, by which Aslett acknowledged it was in default under the terms of the conditional sales contracts, and authorized Northwest to repossess all equipment mentioned in the various contracts. Northwest agreed that it would not hold Aslett liable for any deficiency between the value of the repossessed property and the then existing indebtedness, including balances on the "Conditional Sales Contracts", and advances for operating money. A reservation, however, was made in this agreement as to Estimate #7, which included payments due for work up to August 18, 1959, in the following language:

"However, nothing herein contained shall be construed to in any way prevent the party of the second part (Northwest) from establishing whatever claim it may have to any and all moneys due the parties hereto, or either of them, for work or labor performed under the contract hereinafter described up to and including August 18, 1959, by virtue of an Assignment dated June 17, 1959, * * *".

■ Respondents knew of the June 17th assignment by Aslett to Northwest at the time of their acceptance of the Aslett assignment of August 25th; thus the August 25th assignment would normally be subject to the previous assignment to Northwest. Salem Trust Company v. Manufacturers' Finance Company, 264 U.S. 182, 44 S.Ct. 266, 68 L.Ed. 628; 4 Am.Jur. 314, Assignments § 107; 6 C.J.S. Assignments § 91, p. 1145. Respondents contend, however, that this is immaterial for the reason that by acceptance of the equipment from Aslett under the August 29th agreement, the debt from Aslett to Northwest was fully paid, and the June 17th assignment which covered the payment of Estimate #7, became inoperative. The contention is based on the theory that as soon as the debt or primary obligation is discharged, the thing pledged as collateral security immediately reverts to the owner or pledgor, and hence the assignment by Aslett to respondents became effective.

■ The trial court in its memorandum decision, considered as findings of fact and conclusions of law, (I.R.C.P. rule 52(a)), held that Northwest's reservation of its rights to Estimate #7, as mentioned in the various contracts all related to its right as

created by the June 17, 1959 assignment from Aslett; the court stated:

"That right was specifically designated as *collateral security* to the security created by the 'conditional sales contracts', * * *. On August 29, 1959 defendant (Northwest) accepted delivery of the security of those contracts in full satisfaction thereof and waived any deficiency. With such acceptance and waiver all primary security ceased to exist. Thereafter there remained no security for which Estimate #7 would be collateral security.

"Between August 25 when defendant released its assignment except as to Estimate #7 and August 29 when defendant extinguished the primary security, its claim on Estimate #7 constituted a valid claim as collateral security. This ceased on August 29, 1959."

Which conclusion is based on the premise that the acceptance of the equipment alone was the consideration for the release of any claim for deficiency against Aslett. In our opinion this premise is incorrect for the reason that throughout the negotiations Northwest at all times claimed its right to Estimate #7, based on the June 17, 1959 assignment. Northwest was releasing any claim to a deficiency judgment, and was accepting the equipment, but did not waive any rights to this Estimate #7. Had this agreement not been entered into by the parties, Northwest would still have been entitled to repossess the equipment, Aslett being in default, and still would have been entitled to Estimate #7. Only if the full principal balance had been paid would this estimate then have been released for the respondents and the assignment to respondents then effective. Here, however, Aslett the owner, voluntarily relinquished the property, accepted the waiver of any claim to a deficiency in case the property was insufficient to pay the balance due, and recognized in accepting this waiver that Northwest was still claiming Estimate #7.

Respondents throughout the trial, and again on this appeal contend that the "Conditional Sales Contracts" on their face are usurious and that the extraordinary penalties for usury (I.C. §§ 27–1905, 27–1907) must be held against Northwest. Repondents on three occasions offered proof that the interest of these so-called conditional sales contracts were computed at a usurious rate. These offers of proof were rejected by the trial court; which stated in its memorandum of decision:

"In the first place, the Dale Aslett Sand and Gravel, Inc. is not in any respect a party to this action. Secondly, while * * *, the Aslett corporation assigned its rights under the contract with the government to Leno and Malone, nowhere did it assign to Leno and Malone its rights, whatever they

were, under the 'conditional sales contracts' it had with the defendant corporation. The plaintiff here (respondents), Leno and Malone, being neither parties to nor assignees of the allegedly usurious contracts, the nature of the contracts, as against Aslett, has no bearing on this controversy between Leno and Malone and Northwest Credit Corporation."

The trial court's conclusion that respondents were neither parties to nor assignees of the allegedly usurious contract, is correct. The general rule is, that the right to defend against or attack a contract or security given by a borrower or debtor on the ground that it is tainted with usury, is a right personal to the borrower or debtor and can be asserted only by him and those in legal privity with him. 55 Am.Jur. 409, Usury, § 121; 91 C.J.S. Usury §§ 125, 126, pp. 713, 714. Here respondents have failed to establish any privity with the borrower in relation to the allegedly usurious contracts.

Moreover respondents did not cross-appeal from the trial court's rejection of their offers of proof or conclusions in regard to their contention that such transactions were tainted with usury. While it is contended, that the language in McDougall v. Kasiska, 48 Idaho 424, 282 P. 943, is broad enough to disregard the failure to cross-appeal in this regard, it must be pointed out that there such action was instituted by one who was in privity with the borrowers, the trustee in bankruptcy. No valid reason appears for not adhering to the prior pronouncement of this court that "this court can only notice the errors committed against the appellant not those committed against the successful party, or the respondent in the appeal." Jones v. St. John Irr. Co., 2 Idaho 58, 3 P. 1. See also: Coffin v. Bradbury, 3 Idaho 770, 35 P. 715; Sabin v. Burke, 4 Idaho 28, 37 P. 352; Spongberg v. First Nat. Bank, 15 Idaho 671, 99 P. 712; Hemminger v. Tri-State Lumber Co., 57 Idaho 697, 68 P.2d 54; Harrington v. Hadden, 69 Idaho 22, 202 P.2d 236; Chaney v. Village of Middleton, 58 Idaho 289, 72 P.2d 850.

The judgment is reversed, and cause remanded with directions to enter judgment for appellant, declaring it is entitled to the amount in question.

Costs to appellant.

SMITH, C. J., and TAYLOR, KNUDSON and McQUADE, JJ., concur.