377 P.2d 134

Bernard J. REYNOLDS and Daisy Bell Reynolds, husband and wife, Plaintiffs-Respondents, and Cross-Appellants,

v.

CONTINENTAL MORTGAGE CO., a Washington Corporation, Defendant-Appellant, and Cross-Respondent,

and

John G. Dietrich and Maude Dietrich, husband and wife, Defendants-Respondents.

No. 9003.

Supreme Court of Idaho.

Dec. 18, 1962.

Bandelin & Cogswell, Sandpoint, for appellants.

**174**

McNaughton & Sanderson, Coeur d'Alene, for respondents.

SMITH, Chief Justice.

The records in this cause show that the real name of appellant is Continental Mortgage Corporation, a Washington corporation. It is hereafter sometimes referred to as Continental.

Plaintiffs-respondents Bernard J. Reynolds and Daisy Bell Reynolds, husband and wife, hereafter sometimes referred to as the Reynolds, brought this action seeking a judgment declaring an instrument which they had executed,—on its face a quit claim deed to their real property,—to be a mortgage; also for adjudication of the terms thereof, amount by them owed thereunder, and to whom. The judgment adjudged the deed to be a mortgage and otherwise ad-

judged relief to the Reynolds, but not to the entire extent which they seek. Defendant Continental Mortgage Corporation appealed from the judgment, and plaintiffs Reynolds cross-appealed. Defendants Dietrichs did not appeal. The facts being involved we shall recite them in some detail.

In the fall of 1956, Reynolds and wife desired to purchase from one Morris, who resided in the state of Washington, certain timber lands situate in Bonner County, Idaho. They had $1,050.00 on deposit with a realty company which handled the sale and purchase transaction. The property could be purchased on contract for $4,750.00 but the Reynolds preferred to purchase it at the offered cash price of $3,850; to enable them to do so they sought additional moneys in the form of a loan of $2,800. Some time in November of 1956, they contacted appellant Continental Mortgage Corporation, at its office in Spokane, Washington, concerning such a loan.

The evidence conflicts as to subsequent negotiations. Mr. Crandall, president of Continental, testified to having informed the Reynolds that he could process the loan through a lender; that Continental would charge a commission of $800 for finding a lender; that any expense incidental to the loan would be deducted from such commission; and that the total amount of the loan would be $3,600; the Reynolds thus would obtain the desired $2,800, plus the $800 to

be retained by Continental as a commission. The Reynolds testified, however, that they believed that the loan was to be an ordinary mortgage loan directly from Continental, to be evidenced by their promissory note in favor of Continental for $2,800, bearing 6 per cent interest, and requiring monthly payments of $40 to be secured by their mortgage to Continental. They testified they were never informed otherwise.

The Reynolds further testified that on November 28, 1956, upon instructions from Mr. Crandall, they went to the office of Continental's attorney in Spokane, where the loan transaction was to be completed. Certain papers, including a quit claim deed and an agreement to purchase, were there presented to the Reynolds for signature. They testified that those documents were not completely filled out, showing neither the total amount to be repaid by them nor the name of the other party to the transaction. The Reynolds then testified that they inquired if the instruments should be taken to an attorney of their selection for examination before they signed them, but that Continental's attorney stated that he represented them as well as Continental and that the papers were regular and proper; that relying upon such assurance, and believing the papers to be the usual and ordinary instruments for a mortgage loan, they executed them,—as grantors in a quit claim deed to the property they were purchasing,

and as purchasers or vendees in a form of repurchase agreement. Copies of the signed papers were not given to them. They testified that they never received copies, and that at that same time Continental's attorney informed them that the amount of the loan had been delivered to Morris, the seller of the property, and that the sale had been consummated.

It appears that some time after the Reynolds signed the instruments, the names of defendants-respondents John G. and Maude Dietrich, hereafter sometimes referred to as Dietrichs, who reside at Chelan, Washington, were filled in as grantees in the quit claim deed and as vendors in the repurchase contract; and that the total principal amount to be paid to the Dietrichs by the Reynolds was filled in as $3,600.00.

In January, 1957, the Reynolds began making monthly payments to Continental, the receipts for such payments being issued by Continental's escrow department. The first such receipt however showed the payments credited to the Reynolds, rather than to Dietrichs. Dietrichs were shown as creditors on the subsequent receipts. This first receipt which showed the balance due, after the first payment, as $3,578.00, was later replaced by a so-called "duplicate," crediting the payment to the Dietrichs, although it appears that Dietrichs never actually received this first payment. The Reynolds testified that they observed the balance shown due on this first receipt to be far in excess of the $2,800 which they believed they had borrowed. They attributed this discrepancy to a possible failure to give them credit for the $1,050.00 which had been their deposit with the realty company, to be applied toward the purchase price of the real property. The Reynolds further testified that they made objection to Continental at this time and several times subsequently, although Mr. Crandall, Continental's president, testified that he had received no such objection until the middle of 1958. The Reynolds continued to make payments until the trial of the present action. A subsequent agreement between the Reynolds and the Dietrichs allowed Reynolds to remove timber from the property and to apply the proceeds therefrom to the purchase price; some additional payments were made in this way.

Although Continental contends that the loan was a transaction directly between the Reynolds and the Dietrichs, a deposition by Mr. Dietrich indicates that his first knowledge of the transaction was during the forepart of January, 1957, more than a month after the loan papers had been signed by the Reynolds and the loan proceeds paid over to Morris. In fact, it appears the Dietrichs had no interest in the transaction until January 15, 1957, afer the Reynolds had made their first payment to Continental. Plaintiffs' Exhibit 7, a letter to Mr. Dietrich

from Continental's attorney, dated February 12, 1957, states:

"Please note from the Closing Statement that the unpaid balance at the time that this contract was transferred to you was in the sum of $3,578.00 with interest at 6 per cent from January 15, 1957. The next payment will be made by the purchasers on February 15, 1957, and will be then forwarded to you by the Continental Mortgage Corporation. That payment will include interest from January 15, 1957."

It is clear from the evidence that Mr. and Mrs. Dietrich were not parties to the original transaction, even though their names were later placed upon the instruments. Instead, they acquired their interest after the first payment had been made to Continental, paying therefor not the full $3,600.00 appearing on the face of the agreement, but rather the amount then due, $3,578.00; thus, the right to the first payment does not appear to have been acquired by Dietrichs. It is agreed by all parties that Dietrichs had no knowledge of the $800.00 retained by Continental as a "commission."

November 4, 1957, the Reynolds, after having had the transaction investigated, brought the present action against Continental and the Dietrichs, seeking to have the quit claim deed declared an equitable

mortgage as security for the intended loan, and for other appropriate relief.

The trial court adjudged the Reynolds' quit claim deed to be a mortgage, and the repurchase contract to be void. The court further found and adjudged:

That Dietrichs were innocent of any fraud in the transaction.

That Continental had actually loaned Reynolds $2800.00.

That Continental had wrongfully benefited in the amount of $663.75 (being the $800.00 alleged "commission" less $136.25 legitimate expenses of the loan transaction), and adjudged that Continental pay such sum of $663.75 to Dietrichs.

That Reynolds owed on the mortgage debt to Dietrichs, as of July 5, 1960, the principal sum of $1139.89, figured as follows:

Purchase by Dietrichs at Continental's figure of the Reynolds' mortgage ........$ 3,600.00
Less amount the Reynolds had paid on principal sum ---$1796.36
Less amount adjudged to be paid by Continental to the Dietrichs ...... 633.75   2,460.11
Balance of principal sum of mortgage debt ................$ 1,139.89

The court adjudged that the Reynolds pay to the Dietrichs such sum of $1,-139.89 at 6% interest on deferred balances at the rate of $40.00 a month, less any payments made by the Reynolds after July 5, 1960.

Continental by its assignments of error, in effect, urges insufficiency of the evidence to sustain the judgment, in that the record fails to show by clear and convincing evidence that Continental wrongfully benefited by the loan transaction or committed fraud in connection with the transaction; also that the evidence shows waiver by the Reynolds of all claim of fraud.

The Reynolds on their cross appeal assign as error the failure of the trial court to adjudge in favor of plaintiffs the difference in interest moneys they paid on the basis of a $3600 loan and what they would have paid on the basis of a $2800 loan; also in failing to find and adjudge that Continental had violated the usury statute, and in not charging Continental and the Dietrichs with the penalty of the usury statute.

The Reynolds in their opening statement, at the commencement of the trial, expressly waived any recovery based upon usury; they stated their position to be that they were seeking reformation of the contract and deed so as to constitute the transaction a mortgage to secure the repayment by them of $2800, instead of $3600, with interest, payable in monthly installments. However, during the trial the Reynolds asserted the theory of usury as a basis of recovery by attempting to introduce evidence relating thereto; but the trial court sustained the objection of Continental and the Dietrichs on the ground that the Reynolds had waived usury.

In order to resolve the issue presented by the Reynolds' assignment as it relates to usury we point out that, as a general rule, the law of the state where the contract is made governs; but if the contract is to be performed in a state different than where made, the law of the state of performance governs, even though the obligation is secured by a mortgage on property in the forum state. Vermont Loan & Trust Co. v. Dygert (C.C.Idaho 1898), 89 F. 123. Here, however, though the transaction took place in Washington, and though payment was to be made in that state, Washington law was neither pleaded nor proved. Consequently, we must presume Washington law to be the same as that of Idaho. Newell v. Newell, 77 Idaho 355, 293 P.2d 663 (1956), cert. denied 352 U.S. 871, 77 S.Ct. 95, 1 L.Ed.2d 76.

Continental states its position in its contentions as follows: (1) "The claim of usury, in order to be available in an action upon a contract, * * * where none of the instruments introduced in evidence disclose on their face usury with respect to the contract sued upon, must be affirmative-

ly plead." (2) "Where both parties in an action try their case upon the same theory as to issues tendered by the pleadings, they are bound by the theory so adopted." (3) "The Supreme Court must decide cases on appeal in accordance with the theory of presentation in the trial court."

Conversely, the Reynolds in their reliance upon McDougall v. Kasiska, 48 Idaho 424, 282 P. 943, state their position to be that "Whenever, in the process of trial, the statute meets usury, it operates automatically and forfeiture is complete, independent of any special pleading by the party entitled to the benefit of such forfeiture. It is not a personal right that can be waived since public policy is involved."

Thus the issue is raised, whether the Reynolds, after having expressly waived the theory of usury as a basis of recovery, could again successfully assert it during the course of the trial. The issue requires historical analysis of the usury statute as originally enacted and as later amended, together with decisions of this Court relating to the subject matter.

Idaho's usury statute, as originally enacted in 1887, R.S., § 1266, reenacted R.C. and C.L., § 1540, reads:

"If it is ascertained in any suit brought on any contract, that a rate of interest has been contracted for greater than is authorized by this chapter, either directly or indirectly, in money or in property, *such contract works a forfeiture* of ten cents on the hundred by the year, and at that rate, upon the amount of such contract, *to the School Fund of the county* in which the suit is brought, and the plaintiff must have judgment for the principal sum less all payments of principal or interest theretofore made, and without interest or costs. *The court must render judgment* in said action for ten per cent per annum upon the entire principal of said contract, against the defendant in favor of the Territory *for the use of the School Fund* of the county, *whether the unlawful interest is contested or not*; and in no case where unlawful interest is contracted for, must the plaintiff have judgment for more than the principal sum less the payments already made, whether the unlawful interest be incorporated with the principal sum or not. But no indorsee in due course of negotiable paper, is affected by any usury exacted by any former holder of such paper unless he have actual notice of the usury previous to his purchase; but in such case the judgment above provided in favor of the School Fund must be entered against the drawer or maker, if a party to the action, and he may recover back the usury paid from the party who received the same." (Emphasis supplied).

This statute was construed in Ocobock v. Nixon, (1899) 6 Idaho 552, 57 P. 309, hereinafter sometimes referred to as the Ocobock case. There, a judgment and decree of foreclosure had been entered pursuant to stipulation of the parties. From the complaint it appeared that the notes and mortgage came within the usury statute. Although there was no express waiver of usury, the plaintiffs urged on appeal that the stipulation of judgment was equivalent to waiver of the defense of usury. The court noted that this might be the general rule, but held that such rule did not apply to the defense of usury under the statute, *as it then existed,* saying (6 Idaho at p. 555, 57 P. at p. 310):

"* * * Can the provisions of this statute, and the duty of the court thereunder, be abrogated by stipulation of the parties? We think not. Statutes against usury are penal in their character, and where, as in this state, it is provided that the penalty, or a part thereof, *shall go to the state or to the school fund of the county, and imposes upon the court the duty of rendering judgment for such penalty, such duty cannot be evaded, to the injury of the state or the school fund, by stipulation of parties.* The plaintiff seeks a judgment upon a usurious contract. The statute makes it the duty of the court, whenever the nature of a contract sued upon is ascertained to be usurious under the statute, to render judgment for the penalty." (Emphasis supplied.)

Thus, historically, the specific provision of the 1887 statute that judgment must be rendered for the amount of the penalty in favor of the school fund of the county, whether the unlawful interest be contested or not, controlled the Ocobock decision, and required the trial court to disregard any stipulation of the parties intended to waive the defense of usury; also by virtue of the aspect of the public policy of the statute which required the penalty to be paid into the school fund of the county, this court ruled that its duty to direct such payment was mandatory, which could not be abrogated by a stipulation or waiver of the parties. Thus such rule, although it had its express origin in the usury statute as originally enacted, became one of judicial construction. Cleveland v. Western Loan & Savings Co., (1901) 7 Idaho 477, 63 P. 885; Ford v. Washington Nat. Building & Loan Inv. Ass'n, (1904) 10 Idaho 30, 76 P. 1010, in theory followed the Ocobock decision, the court in the Ford case recognizing that under the 1887 statute the state had an interest in its enforcement in that the state received the benefits of the penalty, and that therefore the statute was more than a law for the protection of the borrower.

Idaho's usury statute, as amended in 1919, S.L. '19, c. 114, § 3, p. 400, reenacted C.S., § 2554, and I.C.A., § 26–1907, reads:

"The taking, receiving, reserving, or charging a rate of interest greater than is allowed by this Chapter, when knowingly done, shall be deemed a forfeiture of the entire interest which the contract carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, *may* recover back, the amount of the interest thus paid from the person taking or receiving the same. No indorsee in due course of negotiable paper, is affected by any usury exacted by any former holder of such paper unless he has actual notice of the usury previous to his purchase." (Emphasis supplied).

The 1919 amendment effected several important changes in the usury statute, viz., (1) It removed the provisions which theretofore limited the statutory penalty to causes of action brought to enforce a usurious contract. (2) The amendment applied to the "taking, receiving, reserving, or charging" of an unlawful interest rate, instead of just to "contracting for" such a rate. (3) The amendment added the very important qualification that, to come within the statute, such taking, etc., of unlawful interest must be knowingly done. (4) The amendment changed the forfeiture from a flat percentage of the amount of the contract, to the entire interest "which the contract carries with it," or agreed to be paid. (5)

Very important, the amendment provided that the person who has paid the usurious interest *may* recover it back, and deleted the requirement that the state must have judgment for the use of the county school fund. (6) The amendment omitted any mention of a mandatory duty on the part of the court to render judgment in relation to the penalties imposed. In the light of such changes in the statute, we might well inquire whether the policy enunciated and the rules established by the prior cases continue to be applicable.

Idaho's usury statute assumed its present form by amendment S.L.1933, c. 197, § 3, p. 390, now I.C. § 27–1907, reading:

"The taking, receiving, reserving, or charging a rate of interest greater than is allowed by this chapter, when knowingly done, shall be deemed a forfeiture by the person so taking, receiving, reserving or charging to the benefit of the person paying or being charged, of the entire interest which the contract carries with it or which has been agreed to be paid thereon, plus twice the amount of such interest. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, *may* recover back the amount of the interest thus paid from the person taking or receiving the same, plus twice the amount of such interest in addition.

No indorsee in due course of negotiable paper is affected by any usury exacted by any former holder of such paper unless he have actual notice of the usury previous to his purchase." (Emphasis supplied.)

Only two significant changes were made by the 1933 amendment: (1) it provided forfeiture of the usurious interest by the person taking, receiving, reserving, or charging it, to the benefit of the person paying it or charged with it (this explicit provision appeared implicit in the 1919 amendment), plus a penalty of twice the amount of such interest; and (2) it provided that the person who has paid the usurious interest, *may* recover it back plus a penalty of twice the amount of such interest.

Olson v. Caufield, (1919), 32 Idaho 308, 182 P. 527, although decided after enactment of the 1919 amendment, was decided on the basis of the statute as it existed before the amendment, inasmuch as the action involved secured promissory notes, executed and becoming due while the 1887 statute was in effect and long before enactment of the 1919 amendment. However, the following persuasive dictum is set forth in that decision (32 Idaho at p. 313, 182 P. at p. 529):

"While it was said by this court that 'under our statutes it is not necessary to set up by plea the defense of usury'

(Cleveland v. Western Loan & Savings Co., 7 Idaho 477, at page 480, 63 Pac. 885), and while C.L. § 1540, provides that, 'If it is ascertained in any suit brought on any contract, that a rate of interest has been contracted for greater than is authorized by this chapter * * *' the court is to enforce the penalties therein prescribed, the rule announced in the latter case would only apply where the usurious nature of the contract appeared either upon the face of the pleadings or upon the face of instruments introduced in evidence. Where the contract is fair and honest on its face, the defense of usury must be pleaded affirmatively in the answer. Otherwise evidence outside of the contract, tending to show the usurious nature thereof, would not be responsive to any issue in the case, would be inadmissible, and there would be no means by which it could be ascertained that a rate of interest had been contracted for greater than is authorized by law."

In evaluating the foregoing cases, we cannot overlook the reasoning of the Ocobock and Ford cases as resting heavily upon the particular provisions of the usury statute as it then existed (the 1887 statute), and especially upon the provision which made it mandatory duty of the court to assess the statutory penalty in favor of the

state for the benefit of the county's school fund.

The Reynolds, in support of their assignment that the trial court erred in not finding that Continental had violated the usury statute, and in thus asserting their right to recover the usurious interest paid plus the penalty, even though they ostensibly had waived that right, rely upon McDougall v. Kasiska (1929), 48 Idaho 424, 282 P. 943, hereinafter sometimes referred to as the McDougall case.

The 1919 amendment to the usury statute, in effect when the McDougall case was decided, was identical in theory with the 1933 amendment, in that both amendments recognized the right accorded a person paying usurious interest, to be permissive and not mandatory; the 1933 amendment provides only the additional right of recovery of the penalty of twice the amount of the usurious interest paid.

In the McDougall case usury was not asserted; but it did appear from the pleadings and the evidence; the trial court on its own motion instructed the jury on the theory, and this Court on appeal upheld a judgment awarding usurious interest. Thus despite the 1919 amendment, the penalty of the usury statute was regarded as exemplifying a public policy required to be assessed whenever usury appeared, even though not asserted in the action; and even though the 1919 amendment eliminated the

mandatory requirement that judgment for ten percent of the entire principal of the usurious contract must be entered in favor of the state for the benefit of the county school fund; and even though the 1919 amendment constituted a controversy arising thereunder as a civil private one between the parties involved, in that it accorded only a permissive right to the party who had paid a usurious rate of interest.

■ The rule of statutory construction that where the courts have construed a statute, its subsequent amendment, or later legislative action on the subject, which does not change or disapprove the judicial construction, will be taken as legislative approval of such construction, is persuasive; but such rule is not absolute and does not debar the courts from reexamining their own previously accepted doctrines or from modifying or overruling their former decisions. Scott v. Gossett, 66 Idaho 329, 158 P.2d 804; Jewett v. Williams, 84 Idaho 93, 369 P.2d 590; In re Elliott's Estate, 22 Wash.2d 334, 156 P.2d 427, 157 A.L.R. 1335; 82 C.J.S. Statutes § 370, p. 853; 50 Am.Jur. Statutes § 443, p. 462.

■ We are of the view that under the usury statute as it has existed since and including the 1919 amendment, any rule which requires rendition of judgment based upon usury, though such issue not be asserted in the action, denies due process of law in judicial proceedings, as guaranteed

by Idaho Const., Art. I, § 13, and U.S. Const., Amendment 14.

In Eagleson v. Rubin, 16 Idaho 92, 100 P. 765, (1909), this Court defined due process in judicial proceedings as follows:

" * * * 'Due process of law,' as used in section 13, art. 1 of the Constitution of this state, and also in the Constitution of the United States, when applied to judicial proceedings, means that every litigant shall have the right to have his cause tried and determined under the rules of procedure, the same as are applied to other similar cases, * * *."

" * * * If the notice given him brings him into court, and gives him full opportunity to have his day in court and have a hearing on the merits of the cause, his rights are not in any way abridged by reason of the fact that he was brought into court in response to a writ or notice different in form or name from an ordinary summons. * * *"

In Fall Creek Sheep Co. v. Walton, 24 Idaho 760, 773, 136 P. 438, the constitutionality of a statute dealing with the disposition of trespassing hogs was discussed. Although the statute was held constitutional, the court quoted from Vol. 10, Am. § Eng.Ency. of Law, p. 299:

"6. Due process of law requires an orderly proceeding adapted to the nature of the case, in which the citizen had an opportunity to be heard and to defend, protect, and enforce his rights, by establishing any fact which, under the law, would be a protection to him or to his property. It has been said that it matters not that it may be difficult for him to defend under the law, so long as it is not impracticable for him to do so by the use of such reasonable efforts as the owners of property may generally be supposed to be capable of. *His opportunity to defend, however, must not be merely colorable and illusory.*" (Emphasis supplied.)

In Roos v. Belcher, 79 Idaho 473, 479, 321 P.2d 210, the constitutionality of a statute authorizing foreclosure of a trust deed by notice and sale without judicial foreclosure was questioned. Although the statute was held constitutional, the court, citing some decisions of the United States Supreme Court, noted that the fundamental requisites of due process of law are notice and opportunity to be heard. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865; Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1368. See also, Foster v. Walus, 81 Idaho 452, 456, 347 P.2d 120; Rich v. Wylie, 84 Idaho 58, 367 P.2d 763, 765.

The rule that a court must render judgment for usury even though not an issue,

denies to the opposing party notice of such issue and a hearing wherein he may present evidence to rebut the claim. Therefore, we hereby overrule the holding in the case of McDougall v. Kasiska, 48 Idaho 424, 282 P. 943, insofar as it holds that in the process of trial whenever usury appears, the forfeiture is complete, even though usury is not an issue.

■ Having determined that on appeal the court may not go beyond the theories upon which the parties relied in the trial court, it is axiomatic that the trial court did not err in refusing to receive evidence on the issue of usury after the plaintiff had expressly waived usury as a basis of recovery.

■ Idaho Rules of Civil Procedure provide that it is not essential to plead a theory of recovery if that theory is raised and tried by express or implied consent of the parties. In order to raise a theory which is neither pleaded nor tried by express or implied consent, it is necessary that a party request the court for leave to amend. I.R.C.P., Rule 15(b).

"It does this in two ways: (a) in effect pleadings are automatically amended to conform to proof on issues tried by express or implied consent; (b) if objection is made to the trial of an issue not raised by the pleadings, an amendment is to be allowed to raise the issue, unless the objecting party can show that he would be *actually prejudiced,* and even in that case the court may permit the amendment and grant a continuance, so that the objecting party can meet the new issue, and thus obviate the prejudice that he would suffer if obliged to litigate the issue at that time. The sporting element in litigation is eliminated." Moore's Federal Practice, Vol. 3, p. 805.

Here the theory of usury as a basis of recovery was expressly waived by the plaintiff in his opening statement. During the course of the trial he attempted to raise the issue, but the defendants objected. The trial court sustained the objection on the ground that the issue had been waived, whereupon plaintiff made an offer of proof. Thereafter the plaintiff made no request for leave to amend. The theory having been neither pleaded nor tried by express or implied consent, and the plaintiff having made no request for leave to amend, he cannot now be heard to complain. Having failed to invoke the trial court's discretion there can be no ground for appeal in the premises; and respondents' and cross-appellants' assignment, asserting error committed by the trial court in failing to find usury committed by Continental, is without merit.

■ We now approach Continental's assignments questioning the sufficiency of the

evidence to sustain certain findings of the trial court to the effect that Continental wrongfully gained in connection with the loan transaction, and in finding in favor of the Reynolds.

The action is grounded on fraud in that the Reynolds allege that they negotiated for and were promised by Continental a mortgage secured loan of $2800.00, and that the instruments relating to the loan which Continental caused to be prepared and presented to the Reynolds, upon which they relied and signed, were by Continental and its agents represented to be for the purpose of evidencing a loan in the amount of $2800, but instead as the Reynolds later discovered the transaction resulted in a deed executed by the Reynolds to their real property to parties then unknown to them, i. e., the Dietrichs, as grantees, and in a repurchase agreement executed by Dietrichs whereby Reynolds agreed to purchase the property for $3600. That upon the Reynolds discovering the true nature of the transaction Continental refused to correct it to correspond with the transaction as originally understood by Reynolds and as represented by Continental; that Reynolds relied upon such misrepresentations to their injury in that they became obligated to repay the sum of $3600, instead of a loan of $2800.00, with interest, which they negotiated for and Continental promised.

Continental upon denial of wrongdoing on its part sought to justify the $3600 loan on the ground that it had informed Reynolds in advance that to negotiate the loan of $2800, it would necessarily have to, and did, charge Reynolds a commission of $800 to be, and which amount was, added to the $2800 loan.

The pleadings thus sharply defined the issue. The evidence, though conflicting, is substantial and is fairly reflected by the pertinent Findings of Fact of the trial court, summarized as follows:

In order to consummate the cash purchase from one Morris of certain Idaho real property, the Reynolds negotiated with, and were promised a $2,800.00 mortgage loan by Continental Mortgage Corporation. The Reynolds believed certain representations made to them by Continental through its president to the effect that the loan would be directly from Continental, evidenced by a promissory note from the Reynolds to Continental in the sum of $2,800.00 at 6% interest, to be repaid in monthly installments of $40 or more, the note to be secured by Reynolds' mortgage in favor of Continental, encumbering their Idaho real property. Some time in November, 1956, certain instruments were prepared by Continental's attorney who, representing that the instruments were for the purpose of the agreed mortgage loan to Reynolds from Continental, presented them to

187

the Reynolds for execution. The Reynolds, believing and relying upon such representation, signed the instruments. Shortly thereafter, on or about December 3, 1956, Continental, for the benefit of the Reynolds, issued its check for $2,763.75 to the vendor, Morris, thus consummating the cash purchase of the Idaho real property by the Reynolds. This sum represented the $2800.00 loan, less certain closing costs of $36.25; additionally Continental paid its attorney $100, accounting for the total of $136.25 as expenses, included in its "commission" of $800. The Reynolds were never advised by Continental that it was acting or intended to act as a broker in obtaining the loan for them, or that they would be charged $800 or any other sum as a "commission" by Continental for obtaining the loan.

During February, 1957, the Reynolds first discovered that the papers they had executed were not a note and mortgage as they supposed, but rather were a deed conveying their Idaho real property to the Dietrichs—who had at all times been complete strangers to the transaction—and a contract to repurchase the property from the Dietrichs, for $3,600.00 with interest at 6% per annum. Upon discovering that the loan instruments were not in accordance with the agreement of the parties, the Reynolds complained to Continental and asked that correction be made, but Continental at all times refused.

In January, 1957, Continental sold the Reynolds' loan paper to the Dietrichs for the sum of $3,578.00, which was the principal balance then remaining due under the repurchase agreement. The Dietrichs were bona fide and innocent purchasers, who actually parted with the sum of $3,578.00, and there was no fraud or overcharging by them. They were not present at any of the negotiations between the Reynolds and Continental, and until the Reynolds discovered the apparent mistake in February, 1957, they never at any time knew that the Dietrichs had claimed any interest in the transaction. At the time of signing by the Reynolds the loan papers were in blank as to the name of the other party, and the names of the Dietrichs were subsequently filled in.

And the trial court concluded that Continental had wrongfully gained $663.75 in the transaction (the $800 by it received less legitimate expense of $136.25 in connection with the loan) which it should repay to the Dietrichs for credit to the Reynolds; also that the deed and repurchase agreement should be declared an equitable mortgage.

The evidence is substantial and competent, though conflicting, in support of the findings of the trial court, as they relate

to the issue of wrongdoing; Zollinger v. Big Lost River Irr. Dist., 83 Idaho 411, 364 P.2d 176; Molstead v. Reliance National Life Ins. Co., 83 Idaho 458, 364 P.2d 883; it is substantial, competent and undisputed in support of the finding that the Dietrichs were bona fide innocent purchasers of the Reynolds' loan paper; Nordick v. Sorensen, 81 Idaho 117, 338 P.2d 766; Clayton v. Clayton, 81 Idaho 416, 345 P.2d 719; and is clear and convincing in proof of Continental's wrongdoing as concluded by the trial court, Shinn v. Smith, 81 Idaho 57, 336 P.2d 690.

The judgment and decree of the district court is modified in the following particulars:

That Paragraph I thereof is amended to read as follows:

> That the defendant Continental Mortgage Corporation (sometimes called Continental Mortgage Company) shall forthwith pay to the defendants John G. Dietrich and Maude Dietrich, husband and wife, the sum of $663.75 together with interest thereon at the rate of 6% per annum from January 15, 1957, to the date of entry of these amendments to said Judgment and Decree.

That Paragraph II thereof is amended to read as follows:

> That the plaintiffs are indebted to the defendants John G. Dietrich and Maude Dietrich, husband and wife, for the sum of $1,139.89, plus interest at the rate of 6% per annum from July 5, 1960, less a sum equal to the interest on the sum of $663.75 at the rate of 6% per annum from January 15, 1957, to the date of entry of these amendments to said Judgment and Decree, and less any payments made by plaintiffs, Bernard J. Reynolds and Daisy Bell Reynolds, husband and wife, since July 5, 1960, to the defendants Dietrichs on the mortgage indebtedness, and that said indebtedness shall be paid by the plaintiffs to the defendants in the following manner, to-wit, in successive monthly installments of $40.00 or more per month, including interest, payable on or before the 15th day of each month, commencing on August 15, 1960.

That Paragraph IV thereof is amended to read as follows:

> That the certain sales agreement made and entered into between defendants John G. Dietrich and Maude Dietrich, husband and wife, as vendors, and the plaintiffs, as purchasers, dated December 1, 1956, and relating to the real property described in Paragraph III of the original Judgment and Decree dated December 12, 1960, be and the same hereby is validated as part and parcel of the equitable mortgage re-

ferred to in said Paragraph III, insofar as said sales agreement fixes the terms of payment and of release of said equitable mortgage.

The judgment and decree of the district court as so modified is affirmed.

Costs to respondents and cross-appellants Bernard J. Reynolds and Daisy Bell Reynolds, husband and wife, to be assessed against appellant and cross-defendant Continental Mortgage Corporation (sometimes referred to as Continental Mortgage Company).

TAYLOR, McQUADE and McFADDEN, JJ., and TOWLES, D. J., concur.