1 P.3d 292

**Richard L. KESSLER and Cheryl Kessler, husband and wife, Plaintiffs–Respondents–Cross Appellants,**

v.

**TORTOISE DEVELOPMENT, INC., Defendant–Appellant–Cross Respondent.**

**No. 24711**

Supreme Court of Idaho,
Twin Falls, November 1999 Term.

May 4, 2000.

Roark Law Firm, Twin Falls, for appellant. R. Keith Roark argued.

Parsons, Smith & Stone, Burley, for respondents. William A. Parsons argued.

WALTERS, Justice.

This is an appeal from a decision of the district court, on remand, granting specific performance of a real estate purchase and sale agreement. In *Kessler v. Tortoise Devel., Inc.*, 130 Idaho 105, 937 P.2d 417 (1997)(*Tortoise I*), this Court determined that the purchase and sale agreement was ambiguous as to the availability of specific performance and vacated a summary judgment granted in favor of the seller. After a court trial on remand, the district court determined that specific performance was available. The court found that it would be inequitable to deny specific performance in this case, but that it would be similarly inequitable to grant specific performance without the imposition of certain conditions. Therefore, the court fashioned an equitable remedy based upon the unique circumstances of the case. We affirm.

## BACKGROUND AND PRIOR PROCEEDINGS

In June 1991, Richard Kessler and Gerald Kingen decided to build a multi-screen theater and restaurant complex in Ketchum, Idaho. Kessler had operated a single screen theater in Ketchum for twenty years and had been planning to build a multi-screen complex since 1986 in order to protect and expand his position in the local market. Kingen had been developing and operating restaurants in the Northwest for a number years. The two initially planned that Kingen would develop the project, which would be condominiumized with the theater unit sold back to Kessler and the restaurant unit retained by Kingen.

In June 1991, Kingen and Kessler purchased a parcel of real property in Ketchum as the site for their planned complex. The property is located in downtown Ketchum

directly across the street from Kessler's single screen theater.

In the spring of 1992, Kingen experienced economic problems and informed Kessler that he could not continue as the developer for their project. Kingen indicated, however, that he was still interested in operating a restaurant in the complex. Geoff Bushell, Kessler's friend and a local real estate broker, agreed to replace Kingen as the developer of the project. Bushell formed Tortoise Development, Inc. (Tortoise) in the fall of 1992 to develop the project. Tortoise was to obtain financing for construction, acquire title to the property previously purchased by Kessler and Kingen, construct the building, condominiumize the building into two units, sell the theater unit to Kessler, and lease the restaurant to Kingen under a long term lease.

Tortoise entered into a construction contract with Avery Construction, Inc., on April 22, 1994 with a "guaranteed maximum price" of $974,623. Although Tortoise had received only a conditional commitment for construction financing from Calumet Federal Savings, Avery began construction of the project on May 19, 1994. Tortoise was ultimately unable to secure a final commitment for financing from Calumet and could not pay Avery. Consequently, Avery pulled off the project on July 20, 1994, and filed construction liens totaling $358,299.

Bushell and Kessler called Kingen the next day. Kingen traveled to Ketchum to review the project and based upon Avery's representation that the project could be completed for $974,623 agreed to reassume responsibility for the project. Kingen purchased Tortoise Development from Bushell. On the strength of Kingen's financial statement, Tortoise was able to secure a final commitment on the Calumet Savings loan. With this financing, Avery proceeded with construction of the project.

In July 1994, before Avery pulled off the project, Kessler had executed a purchase and sale agreement with Bushell, on behalf of Tortoise, for the purchase of the theater unit. Bushell prepared the agreement on the standard form that he regularly used as a real estate broker. The agreement provided that Kessler would purchase the theater unit of the complex for $725,000 upon completion of the project. Paragraph two recited that Kessler deposited $140,000 cash as earnest money to be held by Tortoise. The remainder of the purchase price was to come from an SBA guaranteed loan, which was conditionally approved in November 1993. The closing date was stated to be no later than December 15, 1994. At the time this agreement was executed, Tortoise had not yet acquired any interest in the underlying real property where the theater complex was being built. The underlying property was still owned by Kessler and Kingen.

On August 23, 1994, after Kingen had purchased Tortoise, Kessler and Kingen executed a purchase and sale agreement with Tortoise for transfer to Tortoise of the underlying real property. In consideration of his interest in the property, Kessler received a credit to be applied toward the purchase of the theater unit in the completed project. Kessler and Tortoise also executed an addendum to the theater purchase agreement. The addendum acknowledged that there was no cash down-payment as indicated by the original agreement. Instead, Kessler was to receive a credit toward the purchase of the theater in exchange for his interest in the underlying property as indicated in the purchase agreement for the underlying property. The closing date was changed to February 15, 1995, with an option to extend the closing date until May 15, 1995.

The project proceeded. In December 1994, Kessler was permitted to begin customizing the theater unit for his operation. On March 3, 1995, Tortoise obtained the Certificate of Occupancy necessary for Kessler to commence his theater operations. Tortoise deposited into escrow a warranty deed for the theater unit in preparation for the final closing then set for April 14, 1995. Kessler and Tortoise also executed a "Motion Picture Premises Lease" to run from March 3 until the April 14 closing.

When Tortoise deposited the deed in escrow, the title to the property was marketable. However, beginning on March 9, 1995, a series of liens was filed against the project.

Despite efforts to bond around the liens, Tortoise could not obtain marketable title for the scheduled closing. Kessler's financing had been only conditionally approved. When the bank handling the SBA guaranteed loan learned of the liens, it reinstated several previously waived conditions and informed Kessler that it would not extend the loan beyond the April 14 closing date. Consequently, as a result of the liens, the closing did not occur.

Tortoise was ultimately able to obtain releases for the liens. But, rather than the $974,623 "guaranteed" by Avery, Tortoise was forced to pay $1,305,103 to construct the building.

On September 15, 1995, Kessler filed this action for specific performance of the agreement with Tortoise. Tortoise counterclaimed to remove Kessler from the theater unit that he was occupying under the Motion Picture Premises Lease. The district court determined that specific performance was not an available remedy under the purchase and sale agreement and granted summary judgment in favor of Tortoise. Kessler appealed. In *Tortoise I,* this Court determined that the purchase agreement was ambiguous with regard to the availability of specific performance. The summary judgment was vacated and the case was remanded to the district court for further proceedings.

On remand, the district court determined that none of the three potentially applicable provisions in the purchase and sale agreement controlled under the circumstances and therefore the agreement did not limit Kessler's right to seek specific performance. The district court found that the property was uniquely suited for the operation of a four-plex theater and that it would be inequitable not to grant specific performance. The court also noted that Kingen had come in and saved the project when Kessler was unable to do so. Kingen took over Tortoise and placed Kessler in the theater on time. To do this, Kingen was forced to invest substantially more than the contract price to construct the building. In the rush to gain release of the liens for closing, Tortoise had to pay some liens of questionable validity. The court found that it would be inequitable to award specific performance without requiring Kessler to share the increased construction costs. Consequently, the district court ordered that Kessler was entitled to specific performance, but only if he was willing to share the construction costs.

Tortoise appealed from the court's order of specific performance and Kessler cross-appealed from the order requiring him to share the construction costs. Kessler also challenges the court's dismissal of his cause of action for damages.

## DISCUSSION

## I. AVAILABILITY OF SPECIFIC PERFORMANCE

Tortoise argues that the district court improperly granted specific performance because: A) the purchase agreement limited Kessler's remedies to the return of his earnest money under these circumstances, and B) Kessler was not ready, willing, and able to perform the purchase agreement by the closing date. We disagree.

### A. The purchase agreement

 The purchase agreement contains three potentially applicable provisions regarding the remedies available upon breach: the Earnest Money provision, the Default provision, and the Title Insurance Provision.[1]

---

1. **The Earnest Money Provision**

2. EARNEST MONEY

(a) Buyer hereby deposits as earnest money and a receipt is hereby acknowledged of ONE HUNDRED FORTY THOUSAND dollars ($140,000.00) evidenced by $x$ Cash __Personal Check __Cashiers Check __Note Due __ or_____;

. . .

(c) If all conditions have been met by Buyer, Buyer and Seller agree that the earnest money (less credit report fees, and any other Buyer's costs) shall be refunded to Buyer in the event Buyer or Seller cannot consummate the sale due to circumstances beyond their control.

**The Default Provision**

14. DEFAULT. If Seller executes this agreement and title to the property is marketable and insurable pursuant to section ____ hereof and the Buyer fails or refuses to comply with the terms and conditions hereof within five (5)

This Court addressed these provisions in *Tortoise I:*

> [O]ur reading of the default provision, the earnest money provision, and the title insurance provision leads us to the conclusion that the purchase agreement is reasonably subject to at least three reasonable and conflicting interpretations concerning the remedy that is available to Kessler in the circumstances presented here.... Because the purchase agreement is ambiguous, its interpretation presents a question fact concerning which of the three provisions controls.

*Id.,* at 108, 937 P.2d at 420. This Court reversed the summary judgment granted in favor of Tortoise and remanded the case to the district court to determine which of the purchase agreement's provisions applied. Having determined that the agreement is ambiguous regarding the remedies available to Kessler upon default, the interpretation of the agreement is a question of fact to be determined by the district court. *Doyle v. Ortega,* 125 Idaho 458, 461, 872 P.2d 721, 724 (1994); *Bondy v. Levy,* 121 Idaho 993, 829 P.2d 1342 (1992). We must now defer to the findings of the district court if they are supported by substantial and competent evidence. *Conley v. Whittlesey,* 133 Idaho 265, 985 P.2d 1127 (1999).

■ On remand, the district court determined that none of the three provisions applied to the circumstances of this case and held that the purchase agreement did not prevent Kessler from seeking specific performance. This determination was based substantially upon the court's finding that no cash earnest money was deposited by Kessler. Since there was no earnest money deposited, the court determined that neither the Earnest Money provision nor the Title Insurance provision, both of which called for the return of earnest money, were applicable. The court also found the default provision inapplicable because that provision deals solely with Tortoise's remedies.

Tortoise agrees that the Earnest Money provision and the Default provision do not apply to the circumstances of this case.[2] Tortoise argues that the district court should have found that Kessler was limited to the return of his earnest money under the Title Insurance provision, which provides:

> It is agreed that if the title of said premises is not marketable, or cannot be made so within thirty (30) days after notice containing a written statement of defects is delivered to the Seller or if the Seller, having approved said sale fails to consummate the

days from the date on which said term or condition is to be complied with, the Seller shall have the following options: OPTIONS (a) Seller may make a written request for the Earnest Money on deposit with the broker. In such event, broker shall pay from said Earnest Money any and all costs incurred by broker on behalf of the Seller and the Buyer related to the transaction, including but not limited to the costs of title insurance, escrow fees, credit report fees, inspection fees, and attorneys fees, and the balance of the Earnest Money, if any, shall be apportioned one-half (½) to the Seller and one-half (½) to the broker provided the amount to broker does not exceed the agreed commission. Any such disbursement of the Earnest Money shall constitute liquidated damages as against the buyer under this option (a) and any and all interest of the Buyer in the property, if any, shall be terminated *or* OPTION (b) Seller may pursue any legal remedies against Buyer which are available to Seller under Idaho law and shall be entitled to an award of attorney's fees as provided by law or court rule. In such event broker shall pay from said Earnest Money any and all costs incurred by broker on behalf of the Seller and

the Buyer related to the transaction, including but not limited to the costs of title insurance, escrow fees, credit report fees, inspection fees, and attorneys fees, and the balance of the Earnest Money, if any, shall be refunded to Buyer.

**Title Insurance Provision**

19. TITLE INSURANCE.... It is agreed that if the title of said premises is not marketable, or cannot be made so within thirty (30) days after notice containing a written statement of defects is delivered to the Seller or if the Seller, having approved said sale fails to consummate the same as herein agreed, the earnest money shall be returned to the Buyer and Seller shall pay for the cost of title insurance, escrow and legal fees if any.

2. Tortoise agrees that the Earnest Money provision is inapplicable, but not because it refers to earnest money that was never deposited. Tortoise argues that the Earnest Money provision is inapplicable in this case because it only apples "[i]f all conditions have been met by Buyer." Tortoise argues that Kessler did not meet all conditions of the agreement because he did not tender the purchase price at closing.

same as herein agreed, the earnest money shall be returned to the Buyer and Seller shall pay for the cost of title insurance, escrow and legal fees if any.

Tortoise contends that this provision is clear, unambiguous, and the only provision in the agreement specifically applicable to a failure of marketable title. Therefore, Tortoise argues that the district court erred by admitting extrinsic evidence to contradict the clear meaning of the Title Insurance provision.

■ We do not agree that the purchase agreement clearly and unambiguously limits Kessler's right to specific performance under these circumstances. Admittedly, the language of the Title Insurance provision appears unambiguous when viewed in isolation. The ambiguities become apparent only when the Title Insurance provision is viewed in the context of the whole agreement as amended, and the facts of this case as developed on remand.[3] The Title Insurance provision provides that "the earnest money shall be returned to the Buyer." Yet it is clear from the amended purchase agreement as well as the evidence introduced following remand that no cash earnest money was deposited and the parties did not intend that cash would be deposited. Kessler's earnest money was represented by his interest in the underlying property. Thus, it is not clear from the agreement what if anything the parties intended to be returned to Kessler under this provision. It is not clear that the parties intended, through this provision, to restrict Kessler's remedy of specific performance should Tortoise decide that it would not perform the agreement.

■ Tortoise does not dispute the finding that there was no cash earnest money deposited. Instead, Tortoise argues that Kessler did contribute cash towards the purchase of the underlying property and for some improvements to the property. Kessler received a credit for this contribution in exchange for his interest in the property, and, according to Tortoise, he chose to treat this contribution as cash earnest money. Conse-

quently, Tortoise argues that under the terms of the purchase agreement Kessler is only entitled to the cash equivalent of this investment.

We agree that this is a reasonable interpretation of the amended purchase agreement, but it is certainly not the only reasonable interpretation. We hold that there is substantial and competent evidence to support the district court's determination on remand that none of the three potentially applicable provisions of the agreement were applicable and that the purchase agreement did not limit Kessler's right to specific performance under these circumstances.

**B. Kessler's ability to perform the agreement**

■ Tortoise argues that the district court erred in granting specific performance because Kessler was not ready, willing, and able to close on April 14, 1995. We disagree. Ordinarily, where time is of the essence of a contract for sale of real estate, a buyer cannot enforce the contract without tendering payment within the time and according to the contract. *Machold v. Farnan,* 14 Idaho 258, 94 P. 170 (1908). However, a purchaser of real property is not required to tender payment where such a tender would be futile. *See Ford v. Lord,* 99 Idaho 580, 586 P.2d 270 (1978); *Esplendido Apartments v. Olsson,* 144 Ariz. 355, 697 P.2d 1105 (App.1984). In this case, Tortoise informed Kessler prior to the date scheduled for closing, that it could not perform. We do not reach the question of whether Kessler would have been able to perform in this case because tender of the purchase price would have been futile. The district court did not err by granting specific performance.

## II. DISTRICT COURT'S AUTHORITY TO CONDITIONALLY DECREE SPECIFIC PERFORMANCE

On cross-appeal, Kessler argues that the district court erred by reforming the contract

---

**3.** Extrinsic evidence may be used to show a latent ambiguity. *Williams v. Idaho Potato Starch Co.,* 73 Idaho 13, 245 P.2d 1045 (1952). Even if the ambiguity was not evident from the face of the amended purchase agreement, the district court could properly consider testimony to determine whether an ambiguity existed.

to increase the purchase price. This argument mischaracterizes the district court's holding—the court did not reform the contract. The court simply found that it would be inequitable to grant Kessler the remedy of specific performance unless he was willing to share the unexpected costs of constructing the project. The court also required the dismissal of Kessler's claims for damages in addition to specific performance. In other words, Kessler was given the choice of accepting conditional performance or of pursuing his remedies at law. The question in this case is whether the district court had the authority to impose those conditions upon its decree of specific performance.

■■■ There is no legal right to specific performance. *Suchan v. Rutherford,* 90 Idaho 288, 410 P.2d 434 (1966). Specific performance is an extraordinary remedy that can provide relief when legal remedies are inadequate. *Hancock v. Dusenberry,* 110 Idaho 147, 152, 715 P.2d 360, 365 (Ct.App.1986)(citing J. CALAMARI & J. PERILLO, CONTRACTS § 16–1 (2d ed.1977)). The inadequacy of remedies at law is presumed in an action for breach of a real estate purchase and sale agreement due to the perceived uniqueness of land. *Perron v. Hale,* 108 Idaho 578, 701 P.2d 198 (1985). But, specific performance is an equitable remedy and should not be granted when it would be unjust, oppressive, or unconscionable. *Suchan.* When seeking the remedy of specific performance:

> [a party] comes into a court of conscience asking for a remedy beyond the letter of his strict legal right.... To come within the equitable rule he must stand before the court prepared to meet its scrutiny, relying upon the fairness and equitable character of the contract. This must not only be his own position, but he must also show that it is not unjust or oppressive to the defendant to compel him to perform specifically.

*Suchan,* at 302, 410 P.2d at 442–43. The decision to grant specific performance is a matter within the district court's discretion. *Suchan* (citing *Bedal v. Johnson,* 37 Idaho 359, 218 P. 641 (1923)). When making its decision the court must balance the equities between the parties to determine whether specific performance is appropriate. *Suchan; Barnard & Son, Inc. v. Akins,* 109 Idaho 466, 708 P.2d 871 (1985).

■■■ Specific performance should be granted under terms and conditions reflecting the equities of the case.

> A decree of specific performance should be equitable to both the plaintiff and the defendant, and a court of equity, being a court of conscience, is capable of rendering a conditional decree in an action for specific performance, because it can insist that if a party, either plaintiff or defendant, seeks the assistance of such a court, he must do what good conscience demands in the particular case.

71 Am.Jur.2d. *Specific Performance* § 222 (1973).

> In circumstances where an order for specific performance would operate to benefit the petitioner inequitably and unconscionably, a court of equity has discretion to refuse to order specific performance or where possible to condition an order for specific performance so as to account for the petitioner's inequitable conduct.

*Boyd v. Head,* 92 Idaho 389, 393, 443 P.2d 473, 477 (1968). This Court has also stated that "once the equitable jurisdiction of the court has attached, the court should retain jurisdiction to resolve all portions of the dispute between the parties and render equity to all parties without regard to the technical niceties of pleading and procedure." *Barnard & Son, Inc. v. Akins,* 109 Idaho 466, 708 P.2d 871 (1985). We hold that the district court had the discretion to enter a conditional decree of specific performance in order to properly balance the equities of the case.

■■■ We do not believe that the court abused its discretion in this case. The district court made the following findings in this case:

> The Court finds that the piece of property in question in this case is "unique" as the term is applied to the law of specific performance. The property is located in a commercial area and the property has been constructed to host a four-plex the-

atre. Additionally, Kessler has operated a theatre in this specific area of Ketchum for 20 years and testified it is the perfect location for a theatre. The public is familiar with the area and they have developed a custom of coming to this particular area to view movies. The property is located in an area of Ketchum which provides substantial parking for customers. The property is one of a few areas in Ketchum suitable for the development of a four-plex theatre.

. . .

Mr. Kessler has a 20 year history of operating a theater in the Ketchum area. His hopes and dreams are placed in this project. Mr. Kessler has done a lot of footwork and put a lot of thought into this project. He has also invested $140,000.00 in real property. Mr. Kessler entered into the Purchase and Sale Agreement before the construction financing was in place for the project. When the project began to fail, Kessler did not have the personal financing to rescue the project. Kessler also refused to pay additional rent when the project went over budget, thus shifting the entire burden of saving this project to Kingen.

In August of 1994, Mr. Kingen saved this project. "But for" Kingen, this project would have been lost. Kingen has invested $1,760,000.00 or the equivalent thereof to finish this project. Additionally, Kingen placed Kessler in the theater in a timely manner.

The court also noted that there was some question regarding the responsibility for the liens that prevented the closing and caused the extra construction expenses. Kingen paid the liens, but in the rush to close and place Kessler in the theater unit some questionable liens may have been inadequately defended. The court stated "[i]t is this Court's belief, that not all of these liens may have been well founded. We will never know the answer to this question." Based upon these findings, the court determined that it would be inequitable either to deny Kessler specific performance entirely or to grant specific performance without a contribution by Kessler toward the unexpected additional costs of construction and the dismissal of Kessler's damage claims. Therefore, the court held that Kessler was entitled to specific performance only upon payment of a share of the additional costs and dismissal of Kessler's damage claims. Under the unique circumstances of this case, we hold that the court did not abuse its discretion.

### III. ATTORNEY FEES ON APPEAL

Kessler requests attorney fees under paragraph 17 of the purchase and sale agreement signed on August 23, 1994, for the sale of the underlying property from Kessler and Kingen to Tortoise. This case, however, involved Kessler's attempt to enforce the separate agreement for the sale of the Theater unit in the finished complex, not the August 23 agreement. Kessler is not entitled to attorney fees under a provision in the August 23 purchase agreement. Moreover, since both parties have prevailed in part, no attorney fees are awarded on appeal.

### CONCLUSION

The district court's decision is affirmed. Each party shall bear its own costs and attorney fees.

Chief Justice TROUT and Justices SILAK, SCHROEDER and KIDWELL, concur.

